#24681-a-SLZ

**2009 SD 100**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

THOMAS MUHM,                              Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JOHN J. DELANEY
Judge

* * * *

MARTY J. JACKLEY
Attorney General

MEGHAN N. DILGES
Assistant Attorney General          Attorneys for plaintiff
Pierre, South Dakota                and appellee.

TIMOTHY J. RENSCH
Rensch Law Office                   Attorneys for defendant
Rapid City, South Dakota            and appellant.

* * * *

CONSIDERED ON BRIEFS
ON MAY 26, 2009

OPINION FILED **11/18/09**

#24681

ZINTER, Justice

[¶1.]     Thomas Muhm was convicted of all five counts in an indictment alleging:  one count of attempted first degree rape, one count of first degree rape, two counts of sexual contact with a child under sixteen, and one count of criminal pedophilia.  The charges arose from allegations of weekly sexual abuse of two boys over several years.  Muhm appeals arguing that:  (1) the counts were multiplicitous and duplicitous in violation of due process and double jeopardy concerns; (2) the State failed to give notice of a report and the opinions of an expert witness; and, (3) the circuit court erred in failing to grant a new trial on the ground of newly discovered evidence.  We affirm.

*Facts and Procedural History*

[¶2.]     J.C. and C.S. regularly spent weekends with Muhm, a family friend at the time.  C.S. began spending weekends at Muhm's home when C.S. was seven or eight years-old, and J.C. began spending weekends when he was six or seven.  The State alleged that Muhm repeatedly sexually abused the boys during these weekend visits.

[¶3.]     The alleged abuse came to light in January 2006.  The boys' mother testified that she had taken them to the doctor because J.C. had a rash on his foot and he had complained of a rash on his penis.  After returning home, C.S. told his mother that he knew why there was a rash on J.C.'s penis.  C.S. stated that Muhm had been sucking J.C.'s penis and making J.C. do things he did not want to do.  C.S. also told his mother that Muhm put his penis in the boys' "butts" and then made

-1-

them do the same to Muhm. After receiving similar information from J.C., the boys' mother called the police.

[¶4.]    On February 2, 2006, the boys were interviewed by Lora Hawkins, a child forensic interviewer. During separate videotaped interviews, the boys disclosed further details of abuse. J.C., the younger brother, indicated that Muhm started touching J.C. when he was about seven, and the last time it had happened was about a week-and-a-half prior to the interview. J.C. said Muhm would put his hands on J.C.'s "pee-pee," and Muhm would put his "pee-pee" on J.C.'s "butt." J.C. also stated Muhm tried to put his "pee-pee" in J.C.'s "pooh hole," but Muhm's penis never "went in." J.C. indicated this happened more than once. J.C. also disclosed having to "jack off" Muhm, and Muhm doing the same thing to J.C. J.C. could not, however, describe what he meant by "jack off." J.C. finally disclosed having to lick chocolate syrup from Muhm's "pee-pee" and Muhm sucking on J.C.'s penis. J.C. denied ever having to do anything with Muhm's "pooh hole." J.C. told Hawkins that these things happened many times and that these things also happened to C.S. He also informed Hawkins that his stepbrother, S.R., was in prison for doing these same types of things to a neighbor. When Hawkins asked J.C. if S.R. had ever done something "icky to him," J.C. responded, "No."

[¶5.]    C.S. similarly indicated that Muhm had been touching both C.S.'s and J.C.'s "privates." When asked what he meant by "privates," C.S. said "penis and butt." C.S. told Hawkins that Muhm would suck and rub C.S.'s penis. He indicated Muhm would put chocolate syrup on his own penis and make the boys lick it. C.S. also indicated that Muhm would put lubricants on his penis and on C.S.'s buttocks

and then stick his penis inside C.S.'s "butt." He said this happened around thirty times. C.S. also told Hawkins that Muhm would make C.S. put his penis in Muhm's "butt," and that this occurred twenty times. C.S. said that the "bad stuff" always occurred on the couch in Muhm's living room. C.S. said he observed Muhm doing these things to J.C. and no one else had touched C.S.'s body in a similar manner.

[¶6.]    After the interviews, a deputy sheriff contacted Muhm. During a forty-five minute non-custodial interview, Muhm denied any molestation of the boys, said that he did not understand why the boys would make such allegations, and indicated that he loved the boys like they were his own children.

[¶7.]    In March 2006, the boys testified in front of a grand jury. Additional details and some inconsistencies arose in comparison with their interviews with Hawkins. Nevertheless, the general pattern of weekly sexual abuse over several years remained the same.[1]

---

1.    J.C. told the grand jury Muhm touched J.C. in the "pee-pee" and "pooh hole" when he was nine, and that Muhm would "jack him off." According to J.C., this happened more than five times. J.C. still could not explain or describe "jacking off." J.C. indicated Muhm would touch J.C.'s "butt," rub J.C.'s "butt cheeks," and put his penis inside J.C.'s "butt." He said this happened more than five times. J.C. said he sucked Muhm's penis every weekend night he went to Muhm's house. J.C. also testified that Muhm did not have J.C. put his "pee-pee" in Muhm's "butt."

C.S. testified Muhm sucked his penis, C.S. never sucked Muhm's penis, and Muhm had anal sex with C.S. three times. C.S. explained that the first few times, Muhm was not able to accomplish penetration, but eventually Muhm was able to get his penis in C.S.'s "butt." C.S. also testified that Muhm wanted C.S. to put his penis in Muhm's "butt," but C.S. refused. C.S. further testified about "'jacking off" with Muhm, and that the last time something happened was the last time he was at Muhm's. Finally, C.S. testified that he saw Muhm sucking J.C.'s penis.

[¶8.] On March 16, 2006, Muhm was indicted on thirty-seven counts involving the two boys and four different statutory offenses. The charges were grouped within five categories. The first three categories charged repeated violations of three different statutory offenses involving J.C. occurring over two and one-half years. The last two categories charged repeated acts of two statutory offenses involving C.S. occurring over more than five years. Counts within each category were identical and undifferentiated; *i.e.*, they charged the same statutory offense with the same boy and did not allege specific times and places of the acts. The counts within these categories charged:

- Counts 1-2: three acts of Attempted First Degree Rape of J.C. between July 12, 2003 and January 31, 2006;

- Counts 3-7: five acts of First Degree Rape of J.C. between July 12, 2003 and January 31, 2006;

- Counts 8-17: nine acts of Sexual Contact With a Child Under Sixteen (J.C.) between July 12, 2003 and January 31, 2006;

- Counts 18-27: nine acts of Sexual Contact With a Child Under Sixteen (C.S.) between October 23, 2000 and January 31, 2006; and

- Counts 28-37: nine acts of Criminal Pedophilia with C.S. between October 23, 2000 and January 31, 2006.

[¶9.] Muhm moved for a bill of particulars. After the State filed a bill of particulars, Muhm moved to dismiss the indictment on the grounds of multiplicity and duplicity of counts. In this motion, Muhm requested that the State be required to elect one count from each of the five categories for trial. The State agreed to the request, and the case proceeded to trial on only one count of each category of offense (counts 1, 3, 8, 18, and 28).

[¶10.]      Three pretrial motions are relevant to this appeal.  First, the State moved to introduce other crimes, wrongs, or acts under SDCL 19-12-5 (Rule 404(b)).  The circuit court ruled that the State could not introduce the other acts identified in the State's notice.  That ruling did not prohibit evidence of the repeated acts of alleged misconduct that had been charged in the dismissed counts.  Second, in response to a defense motion, the court entered a discovery order requiring the State to provide the defense a list of the State's experts, including their reports and opinions.  The third motion was filed on the first day of trial.  Muhm moved to require the State to elect a particular act that the State would use to prove each count and to exclude evidence of the other repetitive sexual acts.  This motion was denied.

[¶11.]      At the time of trial, C.S. was twelve-years-old and J.C. was ten.  The boys again described weekly sexual abuse occurring over the time periods alleged.  And, as occurred in the grand jury proceedings, additional inconsistencies arose in their testimony.[2]

---

2.      For example, at trial, C.S. testified he put his penis in Muhm's "butt" every time he was with him, as opposed to his grand jury testimony that he never put his penis in Muhm's "butt."  C.S. also testified he sucked Muhm's penis many times, but at the grand jury he testified that he never sucked Muhm's penis.  Finally, C.S. testified Muhm had anal sex with him every other day he was at Muhm's, yet at the grand jury he testified it happened only three times.

J.C. testified Muhm "raped" him and Muhm's penis went inside J.C. "four or five" times, but J.C. told Hawkins that Muhm's penis never went inside his "poophole."  As opposed to his pretrial statements, J.C. testified he never had to suck chocolate syrup from Muhm's penis.  J.C. also testified he had to put his penis in Muhm's anus, whereas before trial he had stated "that never

(continued . . .)

[¶12.] The State called Dr. Leslie Fiferman, a psychologist, to testify about the traits of sexually abused children. Although the State had provided notice that Dr. Fiferman would testify and had identified the topics he would address, no further detail or report were provided. Therefore, immediately prior to Dr. Fiferman's testimony, the defense moved to exclude the testimony on the ground that no report or disclosure of his opinions had been made. The circuit court indicated that the State violated the discovery order, but allowed Dr. Fiferman's testimony.

[¶13.] The jury returned a verdict of guilty on all five counts. Muhm subsequently moved for a new trial, alleging a multiplicitous and duplicitous indictment that violated due process and double jeopardy protections. Muhm also alleged a discovery violation arising from Fiferman's testimony. While the motion was pending, the State produced a report concerning the children's stepbrother, S.R. In that report, S.R. admitted to molesting C.S. Muhm thereafter submitted a second new trial motion based on this newly discovered evidence. All motions were denied.

*Decision*

I. *Whether Muhm was Denied Constitutional Protections by the Circuit Court's Denial of his Motion to Require the State to Elect One Specific Act as the Sole Basis for Each Count.*

[¶14.] As previously mentioned, before trial, the thirty-seven counts of the

---

(. . . continued)
happened." As to "jacking off," J.C. stated before trial that this happened eight or nine million times, whereas at trial he could not remember one time.

indictment were reduced to five. Each surviving count alleged a different sexual act involving either J.C. or C.S. Because the children alleged that each type of sexual act occurred repeatedly, Muhm moved to require State to elect one particular act as the sole basis for each count and to exclude evidence of the repetitive acts involving that same sexual offense. Muhm argued that without limiting the State's proof to one predetermined act for each count, the State would have multiple acts available to prove each count. Muhm contended that without an election, the indictment was multiplicitous and duplicitous depriving him of due process and the protections provided by the Double Jeopardy Clause.

[¶15.] The State responded that it would be unable to proceed with the prosecution if an election were required. The State explained that because of the young ages of the children and the repetitive nature of the alleged abuse over such a lengthy period of time, it would not be possible to make such an election before trial. The prosecutor explained:

> There is no way for me to know sitting here today what those two boys are going to say when they take that stand. They are so young and so damaged. This abuse went on for so long. There is not going to be any way I can specify one particular act of rape when they were raped every weekend for four years. I can't do it. They can't do it.

[¶16.] The circuit court denied the motion recognizing the repetitive nature of the allegations and the difficulty a young child would have recounting any particular act.[3] The court also indicated that the defense had taken contradictory

---

3. The California Supreme Court recognized that "it would be impossible for the prosecutor to select a specific act he relies on to prove the charge" in this type of case where a child is only able to recount a generic pattern of repeated

(continued . . .)

positions by first requesting a dismissal of the multiple counts charging each repeated act; and then, after having obtained the State's agreement to dismiss the multiple counts, seeking to restrict the State from relying on the repeated acts to prove its case.

[¶17.]　　　On appeal, Muhm argues that the counts were multiplicitous and duplicitous. He further points out that the children testified "in vague fashion" (they did not differentiate between every repeated act within each category). Therefore, he argues that one or more acts, or even different acts, could have been the basis for the guilty verdict on each count. Muhm contends that this method of charging and proof deprived him of due process and the constitutional protection against double jeopardy.

[¶18.]　　　We begin our analysis by discussing multiplicity, duplicity, and the related constitutional concerns. Whether an indictment is multiplicitous or duplicitous is a question of law reviewed de novo. United States v. Roy, 408 F3d 484, 491 (8thCir 2005); United States v. Damrah, 412 F3d 618, 622 (6thCir 2005).

[¶19.]　　　"'Duplicity' is the joining in a single count of two or more distinct and separate offenses. . . . Multiplicity, on the other hand, is the splintering of a single offense into separate counts in an indictment." 1 Nancy Hollander et al., *Wharton's Criminal Procedure* § 5:12 (14th ed. 2008). In other words, a duplicitous indictment or information includes a single count that captures multiple offenses, whereas a

_____

(. . . continued)
　　　sexual abuse. People v. Jones, 51 Cal3d 294, 308, 792 P2d 643, 650 (1990)
　　　(citation omitted).

multiplicitous indictment or information includes multiple counts all charging a single offense.

[¶20.] Muhm argues both multiplicity and duplicity. However, after the State dismissed all but five counts, the surviving counts were not multiplicitous: each surviving count alleged a different offense involving a different child. On the other hand, the surviving counts were duplicitous. Each count potentially captured repetitive offenses involving the same child. Because Muhm's indictment did not involve multiplicity,[4] we limit our discussion to duplicity and its related double jeopardy and due process concerns.

A. *Double Jeopardy*

[¶21.] "One vice of duplicity is that a general verdict for a defendant on that count does not reveal whether the jury found him not guilty of one crime or not guilty of [all potential crimes covered by the count]. Conceivably, this could prejudice the defendant in protecting himself against double jeopardy." United States v. Starks, 515 F2d 112, 116 (3rdCir 1975). The numerous acts of criminal conduct falling within a duplicitous count, together with generalized allegations of proof, may not, in some cases, prevent a second prosecution from being brought

---

4. Muhm's reliance on *Valentine v. Konteh,* 395 F3d 626 (6thCir 2005) is misplaced. Unlike Muhm's case, *Valentine* did involve multiplicity. The defendant was charged with twenty "carbon copy" counts of only two offenses. *Id.* at 628. Furthermore, the district court's convictions on one count of each offense were affirmed because the prosecutor presented substantial evidence "of ongoing abuse, . . . [so that] had the case been tried in 2 counts [those] convictions would clearly stand." *Id.* at 637 (emphasis added).

against a defendant. That risk occurs if it is unclear exactly which crimes were considered in the first trial. *See id.*

[¶22.]     This double jeopardy concern is not, however, implicated in this case. Concededly, the language of each of the five counts is not tied to a specific time and place. Therefore, each count was broad enough to allow a jury to have considered different sexual acts as the basis for its verdict on each count. Nevertheless, each count did allege that the sexual offense occurred with a specific victim during a period of time. Further, the entire record provides context from which we can conclude that the State would be barred from re-prosecuting on the same or lesser included offenses involving the same children during that period of time.

[¶23.]     As noted in a slightly different situation in *State v. Basker*, 468 NW2d 413, 417 (SD 1991), a nonspecific charge, conceivably involving multiple acts of child sexual abuse occurring over a lengthy period of time, does not violate double jeopardy if the defendant cannot be recharged for sexual offenses occurring within that period. Although "an information should be as specific as possible with respect to time, [we noted that] it is not always possible to know with certainty when an offense occurred. This is especially true in sexual molestation cases involving a minor victim who does not immediately complain to authorities." *Id.* Consequently, we examined non-specific charges involving repeated sexual abuse occurring over several years in the context of the allegations and defenses actually at issue. When considered in that context, we concluded "the indictment adequately apprised [defendant] of the accusations against him such that he could . . . plead any

judgment of conviction founded upon the indictment as a bar to any subsequent prosecution." *Id*. The same is true in Muhm's case.

[¶24.] Considering the allegations and defenses actually presented in this case, Muhm could not be prosecuted again for the same or lesser-included sexual offenses involving these children during the periods of time alleged. The original indictment, bill of particulars, and discovery revealed that the allegations involved weekly sexual acts involving two children and four statutory offenses. Muhm's defense was a complete denial of any sexual act occurring during the entire period of time covered by the indictment. Muhm asserted that there was never any sexual misconduct, that he could not understand why the children would make such allegations, and that the children were not credible. Therefore, all acts of sexual abuse involving the four statutes and two children were at issue at trial, and any further prosecution involving these children during this time period for these or lesser included offenses would be barred. *See id*. *See also* State v. Lafferty, 2006 SD 50, ¶ 13, 716 NW2d 782, 786 (noting that "[b]oth the United States Constitution and the South Dakota Constitution protect [the defendant] from such relitigation."). For that reason, the duplicitous counts did not violate Muhm's rights under the Double Jeopardy Clause.

*B. Due Process*

*1. Notice and opportunity to prepare a defense.*

[¶25.] Muhm argues that the duplicitous indictment violated his due process right to the notice necessary to prepare and present an adequate defense. The

#24681

California Supreme Court described these rights in a similar case involving repetitive, undifferentiated allegations of sexual abuse.

> The "preeminent" due process principle is that one accused of a crime must be "informed of the nature and cause of the accusation." Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial. Thus, the right to defend has two related components, namely, the right to notice of the charges, and the right to present a defense to those charges.

*Jones*, 51 Cal3d at 317, 792 P2d at 656 (citations omitted).

[¶26.]     We have considered these due process rights in a case involving improper sexual contact with a minor occurring over a long period of time. *See Basker*, 468 NW2d at 416. We first observed that a generally phrased indictment alleging repeated sexual contact with a minor over a lengthy period of time is not insufficient.

> For an indictment to be sufficient, it must contain the elements of the offense charged such that it apprises the defendant with reasonable certainty of the accusations against him . . . . When time is not a material element of the offense charged, the indictment need not allege the precise time at which the offense was committed.

*Id.* (citations omitted). Because "time is not a material element of the offense" in crimes involving sexual abuse of minors, *State v. Nuzum*, 2006 SD 89, ¶ 18, 723 NW2d 555, 559, Muhm's indictment was sufficient.

[¶27.]     Further, considering the entire record, our conclusion in *Basker* regarding notice and presentation of an adequate defense is applicable here: we do not "believe the lack of specific dates of the alleged sexual misconduct prohibited [defendant] from asserting [a defense]." 468 NW2d at 417. As the California

-12-

Supreme Court explained: "So long as the evidence presented at the preliminary hearing supports the number of offenses charged against defendant and covers the time frame[s] charged in the information, a defendant has all the notice the Constitution requires." *Jones,* 51 Cal3d at 312, 792 P2d at 653. We see no reason why the same rule should not apply when pretrial notice is furnished through a grand jury transcript or through "pretrial discovery procedures." *See id.* at 320, 792 P2d at 657 (observing that in light of modern trial practice, including the right of cross-examination, "generic child molestation charges by no means deprive the defendant of a reasonable opportunity to defend").

[¶28.] Muhm, however, argues that J.C. and C.S. testified in a "vague fashion," thereby making it impossible to effectively defend. This argument has not been accepted in child sex abuse cases involving similar vague, generic testimony*:*

> [T]he defendant's due process rights are implicated by the inability of his young accuser to give specific details regarding the time, place and circumstances of various alleged assaults. Frequently, as here, these cases involve the so-called "resident child molester" who . . . has continuous access to him[.] In such cases, the victim typically testifies to repeated acts of molestation occurring over a substantial period of time but, lacking any meaningful point of reference, is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults.
>
> Although the cases are widely conflicting, some courts have concluded that prosecutions based on such nonspecific or "generic" testimony deprive the defendant of due process by preventing him from effectively defending against such charges, and by precluding a unanimous jury verdict as to each act charged in the information. Yet testimony describing a series of essentially indistinguishable acts of molestation is frequently the only testimony forthcoming from the victim. To hold that such testimony, however credible and substantial, is inadequate to support molestation charges would anomalously favor the offender who subjects his victim to repeated or continuous

assaults.

*Id.* at 299-300, 792 P2d at 645. In such cases, more specificity is simply impossible:

> Multiple sex offenses committed by adults upon immature and inarticulate children over a long period of time are very likely to result in an amalgamation of the crimes in the child's mind. The child is unlikely to be able to give any testimony approximating the date of any one separately describable offense even in the uncomplicated case. Where the number of offenses is so numerous even an adult would not be able to count them, the child's testimony will often be reduced to a general, and customarily abbreviated, recitation of what happened on a continuing basis.

*Id.* at 313, 792 P2d at 653-54 (citation omitted). Thus, like the court in *Jones*, we conclude that considering the totality of the record (including the bill of particulars, grand jury transcript and pretrial discovery disclosing the specifics of the children's allegations), any duplicitous counts did not deprive Muhm of his due process rights to notice and the opportunity to prepare an adequate defense.

### 2. *Jury Unanimity*

[¶29.] Another vice of duplicity is that because the jury has multiple offenses to consider under a single count, the jury may convict without reaching a unanimous agreement on the same act, thereby implicating the defendant's right to jury unanimity. *See* United States v. Garcia, 400 F3d 816, 819 (9thCir 2005); United States v. Davis, 306 F3d 398, 415 (6thCir 2002); United States. v. Karam, 37 F3d 1280, 1286 (8thCir 1994); *Jones,* 51 Cal3d at 316, 792 P2d at 656. In some situations, a general verdict may not reveal whether the jury unanimously found the defendant guilty of one offense or more offenses, or guilty of one offense and not guilty of others. United States v. Crisci, 273 F3d 235, 239 (2ndCir 2001).

[¶30.]     This concern is of even more significance in cases like this where Muhm was charged with "single act" offenses.[5] In such cases, the due process right to jury unanimity requires that the jury be unanimous as to the single act or acts that are the basis for the verdict. In other words, even though due process may not require time specificity in charging such cases, the jury must have been in agreement as to a single occurrence or the multiple occurrences underlying each count. And, for single act offenses, jury unanimity is not achieved if some of the jurors believed the crime occurred on one occasion during the timeframe and others believed that the crime occurred on a different occasion. Cooksey v. State, 359 Md 1, 9, 752 A2d 606, 610 (2000).

[¶31.]     Muhm argues that his right to jury unanimity was violated because of the general verdict, the duplicitous counts, the long time frames of alleged abuse, and the boys' generic testimony of repeated, undifferentiated acts. Muhm contends that under these circumstances, it is impossible to determine whether the jury

---

5.     Rape (or attempted rape) is a "single act" offense. *See* SDCL 22-22-1 ("Rape is an act of sexual penetration accomplished with any person under any of the following circumstances. . ."). Sexual contact with a child under sixteen is a single act offense. *See* SDCL 22-22-7, and 7.1 (the former statute provides: "Any person, sixteen years of age or older, who knowingly engages in sexual contact with another person . . . if the other person is under the age of sixteen years is guilty of a Class 3 felony." The latter statute defines as a "sexual contact" as "any touching, not amounting to rape, whether or not through clothing or other covering, of the breasts of a female or the genitalia or anus of any person with the intent to arouse or gratify the sexual desire of either party"). Criminal pedophilia is a single act offense. *See* SDCL 22-22-30.1 (2004) ("Criminal pedophilia is any act of sexual penetration accomplished with a victim less than thirteen years of age by any person twenty-six years of age or older.").

reached a unanimous decision on the particular act that was the basis for the conviction on each count.

*The Either or Rule:  Election or a Jury Unanimity Instruction*

[¶32.]     State and federal courts have adopted procedures that balance the need to prosecute cases involving repetitive acts charged in a single count with defendants' rights to due process and the assurance of jury unanimity.  Although some cases have required a prosecution election of specific acts, others have resolved the issue with the use of curative jury instructions.[6]  The most commonly

---

6.     In *Cooksey, supra*, the Maryland Court of Appeals cataloged a number of ways States have approached the issue.

> Several States have dealt, in one context or another, with whether, and under what circumstances, separate single-act sexual offenses committed over an extended period can combine to support a single conviction, under a continuing course of conduct or continuing offense theory.  Many of those cases did not involve the specific issues raised here, of whether a count attempting to charge one offense consisting of disparate offenses committed over a significant period of time is dismissible for duplicity.  Some . . . concerned the specificity of the indictment – the lack of specific dates – rather than whether a count was duplicitous.  Others, reaching the appellate court after trial and conviction, dealt not so much with the validity of the indictment as with whether, when the State alleges a single offense committed during a particular time period but offers evidence of multiple incidents occurring during that period, any of which might suffice to establish the offense, it must elect, either at the beginning or at the end of the case, which incident it intends to proceed upon and the court must then instruct that the verdict must be unanimous as to that incident.

359 Md at 17-18, 752 A2d at 615 (citations omitted).  Although *Cooksey* discusses a number of ways States have considered this issue, *Cooksey's* conclusion misinterprets California law.  *Cooksey* relies on the rationale of *People v. Van Hoek*, 200 CalApp3d 811, 246 CalRptr 352 (1988), which *Jones* specifically overruled.  *See, Jones*, 51 Cal3d at 322, 792 P2d 659.  We

(continued . . .)

followed procedure has been described as the either or rule. *See Jones,* 51 Cal3d at 307, 792 P2d at 649. The rule does not require dismissal of a duplicitous indictment. Rather, the government must elect a single offense on which it plans to rely, and as long as the evidence at trial is limited to only one of the offenses in the duplicitous count, the defendant's challenge will fail. Alternatively, if there is no election the trial court should instruct the jury it must find unanimously that the defendant was guilty with respect to at least one of the charges in the duplicitous count. *See* 1A Charles A. Wright, Andrew D. Leipold, *Federal Practice and Procedure* § 145 (citing United States v. Savoires, 430 F3d 376 (6thCir 2005); United States v. Hughes, 310 F3d 557, 560 (7thCir 2002); United States v. Ramirez-Martinez, 273 F3d 903, 915 (9thCir 2001); United States v. Shumpert Hood, 210 F3d 660, 663 (6thCir 2000); United States v. Karam, 37 F3d 1280, 1286 (8thCir 1994); United States v. Robinson, 651 F2d 1188, 1194 (6thCir 1981); United States v. Robinson, 651 F2d 1188, 1194 (6thCir 1981); United States v. Henry, 504 F2d 1335, 1338 (10thCir 1974); Franklin v. United States, 330 F2d 205, 207 (DC Cir 1964)).

[¶33.]     Application of the either or rule is well described in *Jones,* 51 Cal3d at 307, 792 P2d at 649. Where the prosecution declines to make an election on a duplicitous count and the evidence indicates the jurors might disagree as to the particular act defendant committed, a standard unanimity instruction should be

_____

(. . . continued)
        reference *Cooksey* only to identify and catalog the issues, not to reflect our
        support of its rationale or conclusions.

given. *Id.* at 321, 792 P2d at 658-59. Where, however, the testimony of the victim recounts undifferentiated or generic occurrences of the sexual act, a modified unanimity jury instruction must be given because:

> [A]lthough a prosecutorial election or unanimity instruction can help focus the jury on the same specific act where evidence of several distinct acts has been elicited, nonetheless neither an election nor a unanimity instruction is very helpful where the victim is unable to distinguish between a series of acts, any one of which could constitute the charged offense. In a case consisting only of "generic" evidence of repeated sex acts, it would be impossible for the prosecutor to select a specific act he relies on to prove the charge, or for the jury to unanimously agree the defendant committed the same specific act.

*Id.* at 308, 792 P2d at 650. Therefore, "when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." *Id.* at 322, 792 P2d at 659.[7] In this latter situation, because credibility is usually the "true

---

7. The *Jones* court cautioned that, even under the modified either or rule:

> The victim . . . must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., "twice a month" or "every time we went camping"). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., "the summer before my fourth grade," or, "during each Sunday morning after he came to live with us").

(continued . . .)

issue" -- "the jury either will believe the child's testimony that the consistent, repetitive pattern of acts occurred or disbelieve it." *Id.* "In either event, a defendant will have his unanimous jury verdict and the prosecution will have proven beyond a reasonable doubt that the defendant committed a specific act, for if the jury believes the defendant committed all the acts it necessarily believes he committed each specific act." *Id.* at 321, 792 P2d at 659. We agree with the either or approach.[8]

---

(. . . continued)

51 Cal3d at 316, 792 P2d at 655. The court explained:

> [I]f the victim testified that an act of oral copulation occurred once each month for the first three months of 1990, and the [State] charge[d] three counts of molestation, the jury's unanimous conclusion that these three acts took place would satisfy the constitutional requirement of unanimity.

> Similarly, if an information charged *two* counts of lewd conduct during a particular time period, the child victim testified that such conduct took place *three times* during that same period, and the jury believed that testimony in toto, its difficulty in differentiating between the various acts should not preclude a conviction of the two counts charged, so long as there is no possibility of jury disagreement regarding the defendant's commission of any of these acts.

*Id.* at 321, 792 P2d at 658.

8. The California jury unanimity instruction, entitled "When Proof Must Show Specific Act or Acts Within Time Alleged," provides:

> Defendant is accused [in Count[s] ] of having committed the crime of _____, a violation of section ____ of the Penal Code, on or about a period of time between ____ and ____.
> In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission

(continued . . .)

#24681

[¶34.] In this case, the counts were duplicitous and the children's evidence was vague and generic in that it described numerous undifferentiated acts occurring every weekend. Further, no prosecutorial election was made and there was no instruction requiring jury unanimity instruction on a specific act. Nevertheless, "harmless error" analysis is applied in such cases. As *Jones* recognized, harmless error applies in cases when the trial court fails "either to select specific offenses or give a unanimity instruction" if "the record indicate[s] the jury resolved the basic credibility dispute against defendant and would have convicted the defendant of any of the various offenses shown by the evidence to have

_____

(. . . continued)

> of [a specific act [or acts] constituting that crime] [all of the acts described by the alleged victim] within the period alleged. And, in order to find the defendant guilty, you must unanimously agree upon the commission of [the same specific act [or acts] constituting the crime] [all of the acts described by the alleged victim] within the period alleged. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict.

CA CALJIC 4.71.5. The explanatory note to this instruction explains:

> Where the information charges an act or series of acts within a specified period and the prosecution has not elected to rely upon any specific date or dates, and the alleged criminal activity does not come within the continuous course of conduct exception, use this instruction[.]

> In a case in which the jurors might disagree as to the particular act defendant committed, use the first bracketed phrase. When there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant committed all of them, use the second bracketed phrase and delete the first.

CA CALJIC 4.71.5.

been committed." *See Jones,* 51 Cal3d at 307, 792 P2d at 650 (citing People v. Moore, 211 CalApp3d 1400, 1415-16, 260 CalRptr 134 (1989); People v. Winkle, 206 CalApp3d 822, 828-830, 253 CalRptr 726 (1988); People v. Schultz, 192 CalApp3d 535, 539-540, 237 CalRptr 513 (1987); People v. Deletto, 147 CalApp3d 458, 466, 470-73, and n10, 195 CalRptr 233 (1983)).

[¶35.]     South Dakota has adopted the harmless error rule.

> SDCL 23A-44-14 defines harmless error as "[a]ny error, defect, irregularity or variance which does not affect substantial rights[.]" The harmless error rule governs even constitutional violations, not requiring the automatic reversal of a conviction, provided the court is able to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained.

State v. Michalek, 407 NW2d 815, 819 (SD 1987) (citations omitted). Like the California examples cited above, in this case no alibi evidence was presented and the only issue was the credibility of the child witnesses. The only defense was to undermine the boys' credibility through various means, including pointing out inconsistencies in their statements, their smoking and alcohol use, and a number of other subjects. As the defense stated in closing arguments, "[w]hat this case is about is whether or not these kids will lie about [Muhm] and make stuff up about him." Therefore, "in essence the trial involved a question of credibility, and the jury's verdict necessarily implied that it believed the victim[s]." *See Jones,* 51 Cal3d at 308, 792 P2d at 650. Ultimately, "the jury resolved the basic credibility dispute against defendant and would have convicted the defendant of *any* of the various offenses shown by the evidence to have been committed." *See id.* at 307, 792 P2d at 649. We therefore believe beyond a reasonable doubt that any error in failing to

require an election of acts or giving an appropriate instruction[9] was harmless and did not contribute to the verdict obtained. As the California Supreme Court observed:

> [T]he defendant never suggested he relied on an alibi defense, and accordingly he could not claim prejudice in defending against the charges. . . . [T]he primary issue in these cases is not alibi or identification, but the credibility of accuser and accused. Requiring the [State] to plead and prove specific acts of molestation would result in prosecuting only those defendants who select victims with good memories, or who commit the fewest acts.

*Jones*, 51 Cal3d at 313, 792 P2d at 653 (citation omitted). We agree.

[¶36.] For the foregoing reasons, we conclude that the duplicitous counts neither deprived Muhm of due process nor subjected him to the prohibition against double jeopardy. Muhm's duplicity arguments fail.

> II.     *Whether the Circuit Court Erred in Allowing Expert Testimony.*

[¶37.] Muhm argues that the State violated the discovery order by not providing Dr. Fiferman's specific opinions before trial. Our "standard of review for the violation of a discovery order mirrors the standard applied when reviewing both mistrial motions and evidentiary issues." State v. Reay, 2009 SD 10, ¶ 39, 762 NW2d 356, 367-68 (citation omitted). "[This Court] presume[s] the evidentiary rulings made by a trial court are correct, and review[s] those rulings under an abuse of discretion standard." State v. Krebs, 2006 SD 43, ¶ 19, 714 NW2d 91, 99. Further, if a discovery order is violated, we still must determine "whether the

---

9.     Although the circuit court did not give a unanimity instruction, Muhm did not propose one.

defendant suffered any material prejudice as a result[.]" *Reay*, 2009 SD 10, ¶ 39, 762 NW2d at 368. "Material prejudice is established 'when in all probability . . . it produced some effect upon the final result and affected rights of the party assigning it.'" *Id*. (citation omitted).

[¶38.]     The circuit court's discovery order required the State to provide the defense with "[a] complete listing, designation, and identification of any and all experts the prosecution intends to offer during its case in chief, as well as a complete listing, designation, summary, and identification of each and every expert *opinion* which will be offered in the case in chief, or which is exculpatory or inculpatory in any way."  (Emphasis added.)  The State provided notice that Dr. Fiferman would give testimony on *topics* relating to the traits of sexually abused children.  The notice stated:

> The State will offer testimony regarding the delayed reporting of assaults of children along with the trauma and psychological effects of a child who has been sexually assaulted.  Dr. Fiferman will also testify as to the behavior of children who have been assaulted and the mannerisms in which children display adverse affects [sic] to such traumas.  Dr. Fiferman will discuss how grooming works to discourage reporting and enhances the relationships between the perpetrator and the child victim.  Further, his testimony will be regarding how children communicate to others when they have been assaulted and what difficulties there are in having children describe or discuss being sexually assaulted.

The State provided no report or written document providing further specifics of Dr. Fiferman's topics or whether his testimony might include opinions.

[¶39.]     Before Dr. Fiferman testified, Muhm moved to prevent his testimony because the State had not provided more specifics.  The State responded that there was no discovery violation as it had provided notice regarding the topics Dr.

Fiferman would be addressing. The State also pointed out that Dr. Fiferman prepared no report because he had never interviewed the boys. The circuit court found that the State did not comply with the discovery order, but it allowed Dr. Fiferman to testify.

[¶40.] On appeal, the State argues that even if there was a technical violation of the discovery order, the violation did not prejudice Muhm. The State points out that its notice outlined the topics of Dr. Fiferman's testimony. The notice specifically indicated that Dr. Fiferman would testify to the fact that children delay reporting because of grooming and have difficulty describing or discussing the abuse they have suffered. Muhm responds that he was prejudiced "by not knowing what [Dr. Fiferman's] opinions and testimonial substance were prior to hearing them for the first time in the courtroom." Therefore, Muhm contends that he "could not compare the expert opinions with literature on the topics and consider such in connection with the cross-examination." Considering the notice and actual testimony given, we conclude that Muhm was not prejudiced.[10]

[¶41.] Muhm acknowledges that Dr. Fiferman's testimony consisted of generalities, including such things as how Dr. Fiferman had dealt with both perpetrators and victims, what "grooming" was, examples of grooming behaviors, and how children can act. Muhm also acknowledges that "Dr. Fiferman . . . testified

---

10. Muhm does not argue that Dr. Fiferman usurped the function of the jury by testifying that the boys were actually abused. Nor does Muhm argue that Dr. Fiferman opined whether he thought Muhm was guilty. Notwithstanding repeal of the ultimate issue rule, "[o]pinions merely telling a jury what result to reach are impermissible as intrusive." *See* State v. Guthrie, 2001 SD 61, ¶ 33, 627 NW2d 401, 415.

in rambling fashion using examples from his own experience with clients about how the grooming process works between molesters and children, how children say different things at different times, delayed reporting, and how they will still go someplace where they are being molested."

[¶42.] This acknowledgment and our review of Dr. Fiferman's testimony reveal that his testimony essentially related only to the general topics included in the State's notice. Dr. Fiferman did not provide any testimony regarding J.C., C.S., or Muhm. Furthermore, considering the pretrial allegations and the notice given, Muhm could not have been surprised as to how Dr. Fiferman would testify on these topics. Because Dr. Fiferman's testimony was limited to a general discussion of the disclosed topics, and because this disclosure provided Muhm with the opportunity to retain experts on the same topics, we agree that Muhm has failed to show that "in all probability," Dr. Fiferman's testimony affected his substantial rights and the outcome of the trial.[11] *See Reay*, 2009 SD 10, ¶ 39, 762 NW2d at 368. Therefore, even if the circuit court erred in admitting the testimony, it was not reversible error.

---

11. We also note that Muhm's witnesses from the Department of Social Services (DSS) provided evidence very similar to that provided by Dr. Fiferman. The DSS witnesses testified that in their experience, it was not uncommon for children to be inconsistent, or fail to report the fact that they were being sexually abused. They further testified that a child often denies being sexually abused even though the social worker later discovers that the child was being abused. Because this testimony from other witnesses is quite similar to Dr. Fiferman's testimony, we see no prejudicial effect. *Contrast, Krebs,* 2006 SD 43, ¶¶ 20-21, 714 NW2d at 99 (finding prejudice in the State's violation of a discovery order because the State's witness's testimony "was the only testimony suggesting that [defendant's] injuries were self-inflicted").

### III. *Whether the Circuit Court Erred in Denying a New Trial.*

[¶43.]     Muhm finally argues that the circuit court should have granted a new trial because of newly discovered evidence. We review a circuit court's denial of a motion for a new trial under SDCL 23A-29-1, the same as its civil counterpart SDCL 15-6-59(b). "Whether a new trial should be granted is left to the sound judicial discretion of the trial court, and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion." State v. Gehm, 1999 SD 82, ¶ 12, 600 NW2d 535, 539. For a new trial to be granted, Muhm must demonstrate: "(1) the evidence was undiscovered by the movant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) that it would probably produce an acquittal; and (4) that no lack of diligence caused the movant to fail to discover the evidence earlier." *Id*. ¶ 13, 600 NW2d at 540.

[¶44.]     In this case, we find that the evidence was merely cumulative and impeaching, and there is no probability it would have produced an acquittal. The newly-discovered evidence was the post-trial disclosure of the seventeen year-old stepbrother, S.R., who admitted to his therapist to repeatedly sexually molesting C.S. in the presence of Muhm and J.C. S.R. also admitted watching pornographic movies on the couch in his mother's home.

[¶45.]     Muhm argues that S.R.'s statement that there were pornographic movies in his mother's home contradicts the mother's testimony that there was no pornography in her home. Muhm contends that if the boys watched pornography in their mother's home, it could have provided a basis for the boys' detailed knowledge of sexual abuse. Muhm also argues that S.R.'s admission of molesting C.S. needed

to be "explored" in order to corroborate Muhm's claim that the boys' allegations baffled him. Muhm finally argues that S.R. was 6'2" and 300 pounds, and the jury should have been able to see him, listen to his testimony, and view his demeanor on the stand "in order to determine his place in the whole scheme of things." Although these arguments establish that it may have been useful to "explore" S.R. as a possible witness, they do not establish a probability that the evidence would have resulted in an acquittal.

[¶46.] Furthermore, as the circuit court correctly noted, the evidence was a "doubled-edged sword" that may have hurt more than helped the defense. The court observed that "the contradictions would probably [not] have resulted in a not guilty verdict, particularly in light of the damning portions of the evidence." This observation was based on S.R.'s disclosure that in addition to abusing one of the boys, he had been a victim of Muhm's abuse and a witness to Muhm's abuse of the boys. The evidence was also cumulative and impeaching because, as the circuit court noted, the defense had already done a "first-rate job of pointing out inconsistencies in the children's testimony during the course of the trial." Under these circumstances, we conclude that the court did not abuse its discretion in denying a new trial.

[¶47.] Affirmed.

[¶48.] GILBERTSON, Chief Justice, and KONENKAMP, MEIERHENRY, and SEVERSON, Justices, concur.