#28422-a-JMK
**2018 S.D. 83**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                              Plaintiff and Appellee,

    v.

DANIEL ANTHONY LIVINGOOD,                   Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ROBIN J. HOUWMAN
Judge

\* \* \* \*

MICHAEL J. BUTLER                              Attorney for defendant
Sioux Falls, South Dakota                     and appellant.


MARTY J. JACKLEY
Attorney General

CRAIG M. EICHSTADT
Assistant Attorney General                    Attorneys for plaintiff
Pierre, South Dakota                          and appellee.

\* \* \* \*

                                                ARGUED ON
                                                OCTOBER 2, 2018
                                                OPINION FILED **12/12/18**

#28422

KERN, Justice

[¶1.]     A jury convicted Daniel Livingood of two counts of sexual exploitation of a minor and one count of contributing to the abuse, neglect, or delinquency of a minor. Livingood appeals, arguing the evidence was insufficient to support the verdict. We affirm.

**Facts and Procedural History**

[¶2.]     In 2015, Livingood met the Gambu family, who came to America from a small country in eastern Africa. The family consisted of five members: Lagge Brimo (Mother); Kella Gambu (Stepfather); and their three minor daughters, E.G., O.G., and M.G. The Gambu family was homeless and searching for a rental property when they met Livingood, who lived in a small house on West Bailey Avenue in Sioux Falls and worked as a handyman for a local landlord. The Gambus decided to rent the main floor of that residence from Livingood, which included one bedroom, a living room, a kitchen, and the home's only bathroom. Livingood occupied the unfinished basement and shared the bathroom and kitchen in the main living area with the family.

[¶3.]     When they first met Livingood, E.G. was thirteen, O.G. was ten, and M.G. was six. The three sisters slept together in the living room on the main floor while their mother and father slept in the only bedroom. A single staircase without a door separated Livingood's quarters from the upstairs. As a result, the children could see part of Livingood's bed and T.V. from the top of the stairs and in the kitchen when using the microwave.

[¶4.]     After the family moved in, Livingood and Mother began a consensual sexual affair. The family lived in the house on West Bailey for approximately three

-1-

months before the police arrested Livingood on March 9, 2015, on an unrelated offense. Shortly after his arrest, a neighbor and friend of the children, Chelsea Jorgensen, asked E.G. why the police arrested Livingood. E.G. mistakenly believed it was because Livingood behaved inappropriately toward her and her siblings so she told Jorgensen that he was a child molester. When Jorgensen and her roommate, Kirsten Bielan, questioned the children further, all three girls recounted instances in which Livingood sexually exploited or abused them. Bielan reported her concern about the children to the Department of Social Services. In April 2015, all three sisters were taken to Child's Voice, a medical evaluation center in Sioux Falls, for examination. They each made disclosures to forensic interviewers regarding various sexual acts Livingood committed against them while in the West Bailey house.

[¶5.] During O.G.'s interview with Robyn Niewenhuis, O.G. reported several instances in which Livingood behaved inappropriately. O.G. stated that Livingood sometimes came upstairs naked from the waist down. She also recounted occasions when Livingood would masturbate using the family's lotion, sometimes on a striped couch upstairs and other times on his bed downstairs. She remembered that during one of these instances, Livingood put lotion on his penis and some squirted on the floor. When disclosing this information, O.G. accurately described his penis and hand motions to the interviewer and correctly identified the penis on an anatomical drawing. She also discussed Livingood's habit of watching pornography in the basement and explained that the sound would keep her and her sisters awake at night. She reported that on one occasion, Livingood showed her four pictures of his

penis on his cell phone. She described his penis as "fat and brown." When interviewed by law enforcement in June 2015 as part of the ongoing investigation, Livingood denied many of the allegations.

[¶6.] Sometime in the summer or fall of 2015, the family moved to a rental property on Spring Avenue. After his release from prison in approximately October 2015, Livingood began renting an apartment above the Gambus' new residence. Although the rentals were separated, he frequently went inside the Gambu home as part of his work as a handyman for the property.

[¶7.] In early March 2016, about one year after E.G.'s initial disclosure, M.G. told a teacher that Livingood had touched her. Consequently, all three children returned to Child's Voice for interviews. Kristin Odland interviewed M.G. on March 4, 2016. M.G. said Livingood touched her "private part" more than one time. One incident occurred when M.G. was sleeping with Mother. M.G. explained that Livingood came into the room and began having sex with Mother and, at some point, digitally penetrated M.G.

[¶8.] On March 7, 2016, Amanda Liebl interviewed E.G. and O.G. When Liebl asked O.G. whether she remembered her first visit to Child's Voice, O.G. recalled that it involved "a neighbor" but she refused to acknowledge Livingood by name, stating she did not know him. When questioned regarding her relationship with the "neighbor," she said all she knew was "sometimes he brings us candy." At first, she did not remember what her "neighbor" would do when he came over but later stated that he would watch T.V. with Mother. She said she was not "that angry" and had "no worries" but also admitted she did not like the neighbor because

"he says naughty things" to "all of us," including the "f-word" and the "a-word." When the police interviewed Livingood a second time on March 8, 2016, he told Detective McClure that he was never alone with the children in the house and admonished them for intruding on his space. Livingood denied that he touched M.G. stating, "I never touched the[] girls and the[] girls never touched me."

[¶9.] On March 24, 2016, a grand jury issued a 10-count indictment against Livingood, including two counts of first degree rape and two counts of sexual contact with a child under sixteen years of age for offenses committed against M.G. at the Spring Avenue residence. The remaining six charges occurred at the West Bailey house and included four counts of sexual exploitation of a minor, two involving O.G. and two concerning E.G., and two counts of contributing to the abuse, neglect, or delinquency of a child, one involving E.G., and the other involving O.G. During the pendency of Livingood's case, the State dismissed count two of the indictment, which charged Livingood with first degree rape of M.G.

[¶10.] On August 17, 2016, Livingood moved the circuit court for a bill of particulars, requesting that the State specify which of the alleged acts it intended to use to support each count of the indictment. At a subsequent hearing, the court denied Livingood's motion, finding the indictment sufficient because it "follow[ed] the language of the statutes and provide[d] fair notice to Livingood." *See State v. Hernandez*, 2016 S.D. 5, ¶ 37, 874 N.W.2d 493, 502 (holding a sufficient "indictment must . . . contain the elements of the offense charged and fairly inform the defendant of the charge against him . . . ."). Therefore, the court held the State was "not required to elect which act [would] support which count at [that] time."

Nevertheless, the court observed that "[a]t trial, the State [would] be required to elect a single act for each count or request a unanimity instruction." Four months later, the circuit court held another hearing to consider the State's notice of intent to offer hearsay statements. It admitted E.G., O.G., and M.G.'s statements to the Child's Voice interviewers.

[¶11.] A five-day jury trial began on June 5, 2017. The State called all three children to the stand. E.G. testified that while living on West Bailey, she saw Livingood walk around upstairs half-naked more than once. She explained that Livingood would sometimes "rub his dick" at the top of the stairs and would watch pornography in the basement even though the children could see part of the T.V. and bed from the main floor. She also described one instance where Livingood came upstairs and touched her on the leg.

[¶12.] When O.G. took the stand, she acknowledged she knew Livingood. She remembered visiting Child's Voice only once, in 2015, when she lived with Livingood in the West Bailey house. She testified that while she lived there, she witnessed Livingood masturbating on more than one occasion. She explained that one time, he masturbated while sitting on the kitchen floor by the microwave. She also saw him masturbating on his bed downstairs while she prepared food in the kitchen. Additionally, she testified that she could see him watching pornography on the downstairs T.V. On cross-examination, O.G. confirmed she witnessed Livingood behave inappropriately on multiple occasions but stated she was not sure whether Livingood knew she could see him engaging in sexual behavior. She also stated she

never saw his penis. M.G. also testified, describing for the jury the incident where Livingood touched her vagina with his hand.

[¶13.] In addition, the State presented testimony from three Child's Voice forensic interviewers—Liebl, Niewenhuis, and Odland. The State entered the six recordings from the 2015 and 2016 forensic interviews into evidence. The State also called Special Agent Cunningham and Detective McClure to the stand and played the recording of Livingood's police interview with Special Agent Cunningham from June 2015 and Detective McClure in March 2016.

[¶14.] With the help of an interpreter, Mother testified as part of Livingood's defense. She said her children never told her that Livingood behaved inappropriately. Livingood also called Dr. Dewey Ertz, a psychologist with experience assessing child victims, to the stand. He criticized the interview techniques used by Child's Voice as suggestive. Livingood elected not to testify at trial.

[¶15.] After deliberation, the jury acquitted Livingood of all six offenses involving E.G. and M.G. However, it convicted Livingood of the remaining three counts committed against O.G.—two counts of sexual exploitation of a minor and one count of contributing to the abuse, neglect, or delinquency of a minor. Livingood appeals, raising as his sole issue whether the evidence was sufficient to support his convictions.

## Analysis and Decision

[¶16.] Livingood argues the circuit court erred by denying his motions for judgment of acquittal because the evidence was both factually and legally

insufficient to support the verdicts. We review a denial of a motion for judgment of acquittal de novo. *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83. We analyze "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Plenty Horse*, 2007 S.D. 114, ¶ 5, 741 N.W.2d 763, 765. When studying the evidence, we do "not resolve conflicts in the evidence, assess the credibility of witnesses, or reevaluate the weight of the evidence." *State v. Morgan*, 2012 S.D. 87, ¶ 10, 824 N.W.2d 98, 101. "If the evidence, including circumstantial evidence and reasonable inferences drawn therefrom sustains a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.*

[¶17.]     As specified in the indictment, Livingood's first sexual exploitation conviction involved an activity or simulation of an activity that was "harmful to minors." *See* SDCL 22-22-24.3(1). The second concerned an activity that involved nudity. *See* SDCL 22-22-24.3(2). Focusing primarily on O.G.'s testimony at trial, Livingood argues that no reasonable jury could conclude he sexually exploited O.G. He points to O.G.'s statements on cross-examination, in which O.G. testified she never saw his penis and did not know whether Livingood was aware she could see his activities.

[¶18.]     When reviewing a factual challenge to the sufficiency of the evidence, we "accept that evidence, and the most favorable inferences to be fairly drawn therefrom, which will support the verdict[.]" *State v. Buchholz*, 1999 S.D. 110, ¶ 33, 598 N.W.2d 899, 905. Rather than viewing the evidence in the light most favorable to the verdict, however, Livingood's argument instead relies solely on unfavorable

evidence, ignoring the evidence within the record that "sustains a reasonable theory of guilt[.]" *Morgan*, 2012 S.D. 87, ¶ 10, 824 N.W.2d at 101.

[¶19.] Even though the indictment did not specify which particular acts constituted the offenses charged,[1] the circuit court gave the jury a unanimity instruction prior to deliberation.[2] *See State v. Muhm*, 2009 S.D. 100, ¶ 32, 775 N.W.2d 508, 518–19. In light of the evidence presented, the jurors could have relied on several different instances described at trial when concluding Livingood sexually exploited O.G. on two occasions.

[¶20.] During trial, the jury considered O.G.'s testimony, the statements made during her interviews at Child's Voice, and the content of Livingood's statements to law enforcement. In her 2015 Child's Voice interview, O.G. stated that Livingood would walk to the upstairs bathroom wearing only a long shirt without pants or underwear on. When speaking with Special Agent Cunningham, Livingood confirmed that it was possible that he went upstairs without pants on, and doing so "probably wasn't appropriate."

---

1. In jury instruction 34, the judge informed the jury that "[i]n order to find the defendant guilty, it is necessary for the State to prove beyond a reasonable doubt the commission of a specific act or acts constituting that crime within the period alleged. And, in order to find the defendant guilty, [it] must unanimously agree upon the commission of the same specific act or acts constituting the crime."

2. Given the unique circumstances presented in child sexual abuse cases, we have adopted an "either or" rule. *See Muhm*, 2009 S.D. 100, ¶¶ 32–34, 775 N.W.2d at 518–20. Under this rule, the State must either elect a single offense, or if it does not do so, "the trial court should instruct the jury it must find unanimously that the defendant was guilty with respect to at least one of the charges in the duplicitous count." *Id.* ¶ 32, 775 N.W.2d at 519.

[¶21.] Both at trial and in her 2015 interview, O.G. described instances when Livingood watched pornography on the T.V. downstairs even though she could see it when standing near the microwave upstairs. In the interview, she also disclosed Livingood's habit of masturbating in her presence. When the interviewer asked O.G. to describe his penis, she stated it was "brown" and explained his "hand goes up and down when he puts lotion on." Testimony and Child's Voice interviews from both E.G. and M.G. also corroborated O.G.'s allegations.

[¶22.] In Livingood's audio interview with Special Agent Cunningham, he admitted he masturbated in the basement, stating he was not "going to lie about that." However, he denied masturbating on the main floor. Further, during his interview with Detective McClure, Livingood admitted that he watched pornography downstairs. He explained "the girls snuck down[stairs] sometimes" and may have seen him engaging in sexual activity. Livingood's statements to law enforcement regarding his pornography habit were consistent with O.G.'s 2015 disclosures at Child's Voice when she explained Livingood would watch pornography in the basement and stated the sound would keep her and her sisters awake at night.

[¶23.] As the trier of fact, "the jury . . . resolve[s] the factual conflicts, weigh[s] credibility, and sort[s] out the truth." *State v. Guthmiller*, 2014 S.D. 7, ¶ 27, 843 N.W.2d 364, 372. The jury determined that Livingood sexually exploited O.G. on two separate occasions. Upon our review of the record, we conclude there is a sufficient basis for a rational jury to find Livingood committed these crimes.

[¶24.] Despite this, Livingood argues that the evidence was insufficient to convict him of sexual exploitation because O.G. recanted her statements that Livingood showed her pictures of his penis on his phone. During her 2015 interview, O.G. disclosed that Livingood showed her four pictures of his penis saved on his phone. When questioned about this encounter at trial, however, O.G. could not remember:

> **Q:** [D]o you remember if [Livingood] ever showed you a picture?
>
> **A:** No.
>
> **Q:** Do you remember if he ever showed you his phone?
>
> **A:** No.

Livingood argues this line of questioning at trial demonstrates O.G. recanted her statements regarding the pictures. Thus, Livingood contends that O.G.'s disclosures in her Child's Voice interview regarding the photographs cannot be used to support his conviction. Livingood relies upon *State v. Brende* to support this argument. 2013 S.D. 56, ¶¶ 26–28, 835 N.W.2d 131, 142–43.

[¶25.] The defendant in *Brende* stood accused of several sex crimes, including two counts of first degree rape for sexually penetrating a young child. *Id.* ¶ 1, 835 N.W.2d at 135; *see* SDCL 22-22-1 (requiring penetration as a necessary element of rape). During an interview at Child's Voice, the child struggled to describe the abuse, but disclosed several instances of penetration—one involving Brende performing fellatio on him, another when Brende forced the child to put his penis in

Brende's butt, and the final involving Brende anally penetrating the child.[3]

[¶26.]    When the child testified at trial, he recanted the allegation that he put his penis in Brende's butt.  With reference to the second incident, the child stated that although Brende touched his butt with his penis, penetration did not occur.  He did not testify regarding the incident involving fellatio.  Accordingly, the only substantive evidence presented at trial establishing penetration arose from a video recording of the victim's Child's Voice interview, in which the child described Brende performing oral sex on him.  *Id.* ¶ 23, 835 N.W.2d at 141.  The jury found Brende guilty of two counts of first degree rape.  Brende appealed, attacking the sufficiency of the evidence because the State presented only one act of penetration when his guilty verdict required two.

[¶27.]    We vacated the verdict in part, holding no rational trier of fact could find him guilty of anal rape when the victim recanted the first allegation and denied anal penetration regarding the second.  Critically, we explained that during trial, the State did not present any further evidence to corroborate the allegations of anal sex.  *Id.* ¶¶ 27–28, 835 N.W.2d at 142–43.  We also emphasized the manner in which the child recanted, explaining it did not suggest intimidation or coercion.  *Id.* ¶ 28, 835 N.W.2d at 143.  We upheld the second rape conviction because the Child's Voice video recording presented evidence of oral penetration unrefuted at trial and sufficient to support a single conviction of rape.  *Id.* ¶ 29, 835 N.W.2d at 143.

---

3.    While it may not be anatomically correct, we use the term "butt" because this is the language the child used during his Child's Voice interview and at trial.  *See id.* ¶ 3 n.2, 835 N.W.2d at 136 n.2.

[¶28.] But unlike *Brende*, which involved a recantation of a prior allegation in its entirety, O.G. merely stated that she could not remember a particular instance when Livingood showed her pictures of his penis. She did not deny the allegations that he sexually exploited and abused her. The jury, as the trier of fact, was free to doubt O.G.'s previous statements that Livingood showed her pictures of his penis on his phone based on her faulty memory while testifying. Even if the jury drew that conclusion, viewed in a light most favorable to the verdict, the State submitted other evidence sufficient to sustain his convictions.

[¶29.] In addition, Livingood argues the evidence was *legally* insufficient to sustain his convictions for sexually exploiting O.G. He argues as a matter of statutory interpretation, sexual exploitation of a minor requires the defendant to *engage* the minor in sexual activity. Because O.G. did not report that she directly participated in the sexual activity, Livingood submits that the State failed to establish the elements of the offense.

[¶30.] In South Dakota, sexual exploitation of a minor occurs if:

> [T]he person causes or knowingly permits a minor to engage in an activity or the simulation of an activity that:
>
> (1)  Is harmful to minors;
> (2)  Involves nudity; or
> (3)  Is obscene.

SDCL 22-22-24.3.

[¶31.] The clearest indicator of legislative intent is a statute's plain language. Therefore, the starting point when interpreting a statute must always be the language itself. *See Puetz Corp. v. S.D. Dep't of Revenue*, 2015 S.D. 82, ¶ 16, 871 N.W.2d 632, 637. "[I]f the words and phrases in the statute have plain meaning

and effect, we should simply declare their meaning and not resort to statutory construction." *Dale v. Young*, 2015 S.D. 96, ¶ 6, 873 N.W.2d 72, 74.

[¶32.]     SDCL 22-22-24.3 criminalizes conduct by a person that "causes or knowingly permits a minor to engage in an activity or the simulation of an activity" that meets one of the three situations listed in the statute.  In Livingood's case, this meant activities: (1) harmful to O.G. or (2) involving nudity.  Livingood contends the term *engage* is a transitive verb that must be accompanied by an object.  He asserts that the object of this verb is "activity."  Thus, Livingood argues that the statutory language "causes or knowingly permits a minor to engage in an activity or the simulation of an activity" requires active engagement in the sexual activity. To hold otherwise, Livingood argues, would criminalize activities the legislature intended to exclude from the statute due to its carefully crafted language. Livingood asserts that because O.G. never claimed she interacted with Livingood physically, verbally, or through eye contact, his convictions for sexual exploitation of a minor must be overturned.  The State, on the other hand, asserts that O.G. "engaged in observing" Livingood's masturbation, pornography, and nudity.

[¶33.]     We agree with the State.  By its plain language, SDCL 22-22-24.3 does not require that O.G. actively participate in the acts to be exploited by them.  "We assume 'that statutes mean what they say and that [l]egislators have said what they meant.'" *State v. Bariteau*, 2016 S.D. 57, ¶ 18, 884 N.W.2d 169, 175–76 (quoting *Fin–Ag, Inc. v. Pipestone Livestock Auction Mkt., Inc.*, 2008 S.D. 48, ¶ 56, 754 N.W.2d 29, 50).  The legislature chose to include both the language "engage in an activity" and the phrase "or the simulation of an activity."

[¶34.]     While "engage" is not statutorily defined, it is commonly understood to mean "[t]o employ or *involve* oneself; to take part in; to embark on." *Engage, Black's Law Dictionary* (10th ed. 2014) (emphasis added).  By masturbating and watching pornography in areas where O.G. could see him, Livingood certainly engaged O.G. in sexually exploitive behavior.  These activities were both harmful to O.G. and involved nudity.  Thus, we reject the argument the legislature meant to limit "engage" to only active participation.

[¶35.]     Finally, Livingood contends that if his convictions for sexual exploitation of O.G. are vacated for insufficient evidence, then his conviction for contributing to the delinquency of a minor should be as well.  This is because, in his view, the jury presumably relied on the same facts when finding Livingood guilty of sexual exploitation of a minor as it did when it concluded Livingood contributed to her delinquency.

[¶36.]     Contributing to the abuse, neglect, or delinquency of a child occurs when "[a]ny person who, by any act, causes, encourages, or contributes to the abuse, the neglect, or the delinquency of a child . . . ."  SDCL 26-9-1.  The definition of abuse or neglect in this paradigm includes situations where a child "is subject to sexual abuse, sexual molestation, or sexual exploitation by the child's parent, guardian, custodian, or any other person responsible for the child's care[.]"  SDCL 26-8A-2(8).

[¶37.]     Similar to Livingood's sexual exploitation convictions, the record contains sufficient evidence to support the jury's conclusion that Livingood contributed to the abuse of O.G.  The State established several instances from

which the jury could have chosen to find Livingood guilty. Several witnesses testified that Livingood frequently masturbated near the children and watched pornography where they could see it. Any one of these acts provided sufficient support for the jury's determination that Livingood was guilty of contributing to the abuse of a minor. In light of this, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Plenty Horse*, 2007 S.D. 114, ¶ 5, 741 N.W.2d at 765. The circuit court did not err by denying Livingood's motions for judgment of acquittal.

[¶38.]    Affirmed.

[¶39.]    GILBERTSON, Chief Justice, and JENSEN and SALTER, Justices, concur.