#27301-a-LSW

**2015 S.D. 90**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                         Plaintiff and Appellee,

   v.

KENNETH DALE THOMASON a/k/a
KENNETH D. THOMASON JR.,                        Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RANDALL L. MACY
Judge

* * * *

MARTY J. JACKLEY
Attorney General

CAROLINE SRSTKA
Assistant Attorney General
Pierre, South Dakota                            Attorneys for plaintiff
                                                and appellee.


ELLERY GREY
Grey Law Prof. LLC
Rapid City, South Dakota                        Attorneys for defendant
                                                and appellant.

* * * *

                                                ARGUED ON
                                                SEPTEMBER 1, 2015

                                                OPINION FILED **11/18/15**

WILBUR, Justice

[¶1.]        After this Court vacated defendant's conviction of aggravated theft by deception, the State brought new charges against defendant for forgery and offering false or forged instruments for filing, registering, or recording in a public office. Defendant moved to dismiss the charges asserting that double jeopardy, collateral estoppel, and res judicata barred the State's successive prosecution. Defendant further asserted that the indictment should be dismissed for improper venue. The circuit court denied defendant's motion to dismiss, and a jury found defendant guilty of all charges. Defendant appeals. We affirm.

## Background

[¶2.]        In 2014, this Court vacated Kenneth Dale Thomason Jr.'s (Ken) conviction of aggravated theft by deception. *State v. Thomason*, 2014 S.D. 18, 845 N.W.2d 640. We held that the State failed to prove all the elements of the offense. *Id.* ¶ 30. After we vacated his conviction, the State charged Ken with two counts of forgery in violation of SDCL 22-39-36 and SDCL 22-3-3 (aid and abet), and two counts of offering false or forged instruments "for filing, registering, or recording in a public office" in violation of SDCL 22-11-28.1 and SDCL 22-3-3 (aid and abet). Ken moved the circuit court to dismiss the charges. He asserted that double jeopardy, collateral estoppel, and res judicata barred the State's subsequent prosecution of him because the State had a full and fair opportunity to litigate the newly-indicted charges during the first trial. Ken also moved to dismiss the indictment for improper venue. The circuit court denied Ken's motion to dismiss. During a jury trial in October 2014, the State presented much of the same evidence

and testimony it had presented during the first trial. *See Thomason*, 2014 S.D. 18, 845 N.W.2d 640.

[¶3.] In the second trial, the State presented evidence that Ken and his wife Kim purchased the Gold Town Hotel in Lead, South Dakota on a contract for deed in 2004. Kim's mother, Barbara Langlois, testified that she loaned Ken and Kim money for a down payment on the contract. In exchange for the loan, Ken and Kim gave Barbara a quitclaim deed to the Hotel. Barbara did not file the deed immediately. She, however, continued to loan Ken and Kim money for the Hotel. Barbara testified that she loaned them $328,133.01 in September 2006 because Ken and Kim were facing foreclosure on the Hotel. She claimed that in total she loaned Ken and Kim approximately $500,000.

[¶4.] According to Barbara, she "got mad" because Ken and Kim were not paying on their loans. She explained that she contacted her attorney Brad Schreiber to assist in recovering money from Ken and Kim. Schreiber testified that he advised Barbara to file her 2005 quitclaim deed and serve an eviction notice on Ken and Kim. Barbara filed the quitclaim deed in November 2007 and served Ken and Kim an eviction notice. Thereafter, Schreiber assisted Ken, Kim, and Barbara in arriving at an agreement related to the debt.

[¶5.] On January 7, 2008, the parties signed a "Letter of Intent/Agreement." The letter explained that it was intended "to memorialize numerous emails, telephone conversations and correspondence concerning the [Hotel] and the debt due and owing to Barbara Langlois." The letter noted that Ken was set to close on a loan for $350,000 on January 9, 2008, but that Barbara's recently-recorded 2005

quitclaim deed could impact that loan. Schreiber testified that Ken refused to say where the loan was coming from because Ken believed Barbara might interfere. Nonetheless, the Letter of Intent/Agreement set forth that, following the loan closing and no later than January 14, 2008, Ken and Kim would pay Barbara $200,000 as partial payment on the debt due and owing. Ken and Kim also agreed to "enter into and execute a promissory note and mortgage in favor of Barbara Langlois in an amount not less than $300,000[.]" In exchange for Ken and Kim executing the agreement, Barbara would provide Ken and Kim a quitclaim deed conveying to them all her interest in the Hotel.

[¶6.] The parties signed the Letter of Intent/Agreement, and Schreiber testified that he gave Ken a quitclaim deed. Although Barbara conveyed her interest in the Hotel to Ken and Kim, she also conveyed an equal interest to Ken's son, Kenneth Dale Thomason, III (Dale). Barbara testified that she included Dale within the conveyance because she wanted Dale to be part owner of the Hotel. Schreiber testified that, by including Dale on the deed, Ken and Kim would not be able to sell the Hotel unless all three parties—Ken, Kim, and Dale—signed off on the conveyance.

[¶7.] On January 14, 2008, Ken did not remit payment of $200,000 to Barbara. Rather, Ken emailed Schreiber and informed him the money would come in a week. Schreiber claimed that Ken told him that he was able to close on the loan. When payment did not arrive in a week, Schreiber attempted to contact Ken. Schreiber learned that Ken and Kim had left the country and were in the Dominican Republic. This concerned Schreiber and he decided to conduct a title

search on the Hotel. Through Lawrence Title Company, Schreiber learned that "there [were] some strange things going on." He received a copy of a joint warranty deed that conveyed the Hotel to a "Chris and Shalece Vinson" and a "Special Power of Attorney" instrument appointing Ken and Kim as Dale's attorney-in-fact to execute legal documents related to the Hotel. Schreiber testified that the joint warranty deed bore the signature of "Kenneth Dale Thomason, III" with a "POA" notation. Schreiber relayed this information to Barbara.

[¶8.] Unable to contact Ken and Kim, Barbara filed a complaint with the Lead Police Department. On May 1, 2008, a Lawrence County Grand Jury indicted Ken on charges of aggravated theft by deception over $100,000 in violation of SDCL 22-30A-3. When Ken and Kim returned from the Dominican Republic in 2012, a grand jury issued a superseding indictment, which added charges of aiding and abetting and an alternate charge of aggravated theft by obtaining property without paying.

[¶9.] A jury found Ken guilty of aggravated theft by deception and this Court reversed. *See Thomason*, 2014 S.D. 18, 845 N.W.2d 640. Relevant here is Dale's testimony from the first trial. Dale testified in the first trial that he did not sign the Special Power of Attorney used in the transaction between Ken, Kim, and the Vinsons on January 10, 2008. He further testified that he did not authorize Ken or Kim to convey his interest in the Hotel. The State relied on the allegedly forged Special Power of Attorney and the fact Ken signed the joint warranty deed on Dale's behalf as evidence that Ken was guilty of aggravated theft by deception.

[¶10.] In the second trial, Dale again testified that he did not sign the Special Power of Attorney and did not give Ken authority to enter into the agreement with the Vinsons on his behalf. The Special Power of Attorney bore a notary signature by an "Adrian Polk" from Florida. Dale testified that he had never met Polk, though he was aware that Polk operated a pawn shop in Florida. According to Dale, on January 10, 2008—the day of the transaction—he was in Illinois with a broken vehicle. Dale relayed that Ken had called him and requested that he sign a power of attorney so Ken and Kim could obtain a mortgage on the Hotel. Dale refused and told Ken to wait until he returned to South Dakota. When Dale returned to South Dakota, Ken told Dale that they found a way to get the loan without him.

[¶11.] Dale first learned of the agreement between Ken, Kim, and the Vinsons approximately two months after Ken and Kim had left for the Dominican Republic. According to Dale, Chris Vinson arrived at the Hotel and began to change the locks. Chris told Dale about the agreement and that Dale was issued a check for one third of the sale price. The State entered a copy of the check into evidence at trial. The check bore Dale's signature. Dale testified that he did not sign the check. He claimed that he had no knowledge of the check and did not give Ken authority to sign his name. Kim testified that Ken signed Dale's name on the check and joint warranty deed and included the POA notation on the joint warranty deed.

[¶12.] John Billion also testified. Billion is general counsel and the chief operating officer for Getty Abstract & Title Company in Sioux Falls, South Dakota. He described the January 10, 2008 transaction between Ken, Kim, and the Vinsons. Billion was not personally involved in the closing, but testified that he reviewed all

the documents in preparation for his testimony. He then explained that the closing involved a lease-to-buy-back agreement whereby the Vinsons would pay Ken, Kim, and Dale $350,000 and receive title to the Hotel as security. Under the agreement, Ken, Kim, and Dale were to pay the loan over several years, and Ken and Kim were to continue to occupy and manage the Hotel.

[¶13.] According to Billion, the closing occurred in Sioux Falls because the Vinsons were Sioux Falls residents. However, Getty Abstract merely facilitated the closing and execution of documents. Billion explained that because the property is located in Lawrence County, the documents were required to be filed and recorded with the Lawrence County Register of Deeds.

[¶14.] Billion then testified about the closing process. After paying approximately $140,000 in expenses, Getty Abstract issued separate disbursement checks to Ken, Kim, and Dale for $68,895.71 each. Getty Abstract also prepared a settlement statement, which detailed the contract price, amounts received, and amounts disbursed. Ken signed Dale's name and included a "POA" notation acknowledging receipt of the settlement statement. Ken further signed an "Owners Affidavit" on Dale's behalf with "POA" notation. This affidavit indicated that it was to be returned to Lawrence Title Company and that it was required by "Lawrence Title Company to issue its [title] insurance on the property" owned by Ken, Kim, and Dale. According to Billion, Lawrence Title Company was to handle the filing and recording with the register of deeds. At the conclusion of the closing, Getty Abstract sent Lawrence Title Company the completed paperwork, including the joint warranty deed and Special Power of Attorney, by overnight mail.

[¶15.]     Ruthie Weirs is a senior title examiner and the office manager at Lawrence Title Company. She testified that Lawrence Title Company became involved in the transaction on a request from the lender to do a title search and issue title insurance on the property. According to Weirs, Lawrence Title Company prepared a report and sent it to the lender. Lawrence Title Company also received the joint warranty deed and Special Power of Attorney from Getty Abstract and recorded both with the Lawrence County Register of Deeds Office. Sheree Green from the Lawrence County Register of Deeds Office testified that the Special Power of Attorney and joint warranty deed were recorded with the Lawrence County Register of Deeds Office on January 29, 2008.

[¶16.]     Adrian Polk testified about the Special Power of Attorney instrument. He stated that he did not notarize the instrument for Dale. Although Polk had been a notary for the State of Florida, he let his seal expire in September 2001. He last saw his seal located in his desk drawer at the store. He first learned that his seal had disappeared in 2010, after an attorney from South Dakota called and inquired about the Special Power of Attorney bearing Polk's notary seal. Polk has known Ken since 2002, when Ken worked at Polk's pawn shop in Florida. Polk acknowledged that he may have met Dale in the past, but claimed that he did not know Dale.

[¶17.]     At the conclusion of the State's case, Ken moved for a judgment of acquittal asserting lack of venue, res judicata, collateral estoppel, and double jeopardy. In regard to improper venue, Ken argued that the State failed to present any evidence that he possessed or forged any document in Lawrence County or that

he altered or created any document in Lawrence County. Ken next argued that res judicata barred the State's second prosecution because the State was essentially relitigating an issue that could have been litigated in Ken's first trial. In particular, he asserted that "[i]nstead of arguing grand theft, they're simply taking one component of that, the alleged forgery, and using that to come back and get a second bite at the apple." Lastly, Ken claimed that collateral estoppel and double jeopardy precluded the State from using the same evidence and witnesses in the second prosecution as it had used in the first trial.

[¶18.] The court denied Ken's motion for a judgment of acquittal. The court concluded that there were sufficient facts before the jury to decide venue. It further ruled that the State's second prosecution for different charges involving different elements did not implicate double jeopardy, collateral estoppel, or res judicata. The jury found Ken guilty of all charges, and the court sentenced Ken to a term of years on each charge to run concurrently. Ken appeals and raises the following issues for our review:

1. Whether the circuit court erred when it ruled that double jeopardy and res judicata do not apply.

2. Whether the circuit court erred when it denied Ken's motion to dismiss for improper venue.

**Standard of Review**

[¶19.] Whether a person is twice placed in jeopardy is a question of law reviewed de novo. *State v. Lafferty*, 2006 S.D. 50, ¶ 4, 716 N.W.2d 782, 784 (citing *State v. Cates*, 2001 S.D. 99, ¶ 6, 632 N.W.2d 28, 33). Venue, however, is a question for the trier of fact. *State v. Haase*, 446 N.W.2d 62, 65 (S.D. 1989). Therefore, on

appeal, we accept "the evidence and the most favorable inferences that the jury might have fairly drawn therefrom to support the verdict." *Id.* at 65-66 (citing *State v. Boyles*, 260 N.W.2d 642 (S.D. 1977)).

**Analysis**

***Double Jeopardy and Res Judicata***

[¶20.]     Ken argues that double jeopardy and res judicata preclude the State from retrying him on the same facts under a new theory of guilt when the State had a full and fair opportunity to prosecute him for the newly-indicted charges in its first trial. Ken directs this Court to *Bank of Hoven v. Rausch*, for the proposition that "a person should not be twice vexed for the same cause and public policy is best served when litigation has a repose." *See* 449 N.W.2d 263, 266 (S.D. 1989). More specifically, Ken relies on this Court's four-part test in *Springer v. Black*, for his argument that res judicata precludes the State's successive prosecution. *See* 520 N.W.2d 77, 79 (S.D. 1994). The test questions: "(1) [w]hether the issue decided in the former adjudication is identical to the present issue; (2) whether there was a final judgment on the merits; (3) whether the parties in the two actions are the same or in privity; and (4) whether there was a full and fair opportunity to litigate the issues in the prior adjudication." *Id.* Ken then asserts that the first part is met because "both trials were virtually identical as they involved nearly all of the same witnesses and exhibits" and because the harm to be redressed "in the second litigation is essentially the same harm [the State] tried to address in the first litigation[.]" The second and third factors are met because the parties are the same and there was a final judgment on the merits after this Court reversed Ken's first

conviction. Lastly, according to Ken, the fourth factor is met because "no additional discovery was conducted and more importantly no substantively new evidence was presented during the second trial."

[¶21.] In response, the State asserts that the *Blockburger* test controls. The *Blockburger* test provides: "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182, 76 L. Ed. 2d 306 (1932); *State v. Weaver*, 2002 S.D. 76, ¶ 10, 648 N.W.2d 355, 359. The State then contends that double jeopardy and res judicata do not bar the State's successive prosecution because aggravated theft by deception, forgery, and offering false or forged instruments for filing, registering, or recording are separate crimes that require proof of additional facts the others do not.

[¶22.] "The Fifth Amendment of the United States Constitution and Article Six of the South Dakota Constitution forbids placing a person in jeopardy twice for the same offense." *State v. Danielson*, 2010 S.D. 58, ¶ 7, 786 N.W.2d 354, 356 (citing U.S. Const. amend. V; S.D. Const. art. VI, § 9). In *State v. Dillon*, we recognized that "[t]hese provisions shield criminal defendants from both *multiple prosecutions* and multiple punishments for the same criminal offense if the Legislature did not intend to authorize multiple punishments in the same prosecution." 2001 S.D. 97, ¶ 13, 632 N.W.2d 37, 43 (emphasis added); *United States v. Dixon*, 509 U.S. 688, 704, 113 S. Ct. 2849, 2860, 125 L. Ed. 2d 556 (1993). However, "[t]he defense of double jeopardy has no application to another or different

offenses." *State v. Pickering*, 88 S.D. 548, 552, 225 N.W.2d 98, 100 (1975). "[T]he constitutional and statutory prohibitions against double jeopardy apply only to a second prosecution for the same act and crime, both in law and in fact, upon which the first prosecution was based." *Id.*

[¶23.] Here, Ken was first charged and convicted of aggravated theft by deception over $100,000 in violation of SDCL 22-30A-3. That statute provides in relevant part that:

> Any person who obtains property of another by deception is guilty of theft. A person deceives if, with intent to defraud, that person:
>
> > (1) Creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind. However, as to a person's intention to perform a promise, deception may not be inferred from the fact alone that that person did not subsequently perform the promise; . . .
> >
> > (3) Fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom the deceiver stands in a fiduciary or confidential relationship[.]

*Id.* At Ken's first trial, the State alleged that Ken violated SDCL 22-30A-3 when he obtained the proceeds of the lease-to-buy-back agreement by deception and did not pay Barbara $200,000 as agreed to in the Letter of Intent/Agreement. *Thomason*, 2014 S.D. 18, ¶ 18, 845 N.W.2d at 644.

[¶24.] In its successive prosecution, the State charged and convicted Ken of two counts of forgery in violation of SDCL 22-39-36, and two counts of offering false or forged instruments for filing, registering, or recording in violation of SDCL 22-11-28.1. Forgery occurs when "[a]ny person who, with intent to defraud, falsely makes,

completes, or alters a written instrument of any kind, or passes any forged instrument of any kind[.]" SDCL 22-39-36. A violation of SDCL 22-11-28.1 occurs when "[a]ny person who offers any false or forged instrument, knowing that the instrument is false or forged, for filing, registering, or recording in a public office, which instrument, if genuine, could be filed, registered, or recorded under any law of this state or of the United States[.]" At the second trial, the State presented evidence that Ken passed the forged Special Power of Attorney and joint warranty deed with the intent to defraud and offered the false or forged documents for filing, registering, or recording in a public office.

[¶25.]        From our review of the State's successive prosecution of Ken, we cannot say that the State placed Ken twice in jeopardy for the same criminal offense. The successive prosecution did not involve "the same act and crime, both in law and in fact, upon which the first prosecution was based." *See Pickering*, 88 S.D. at 552, 225 N.W.2d at 100. Although the State used Ken's conduct related to the Special Power of Attorney and joint warranty deed in both trials, the State did not litigate in the first trial whether Ken in fact caused those documents to be forged with the intent to defraud. The State also did not use the evidence to litigate whether he offered those documents for filing, registering, or recording. Rather, the act litigated in *Thomason* was whether Ken "obtained by deception [*Barbara's*] *property* worth over $100,000[.]" *See* 2014 S.D. 18, ¶ 17, 845 N.W.2d at 644 (emphasis added). Furthermore, on the face of the statutes defining the offenses, it is clear the crimes of (1) aggravated theft by deception, (2) forgery, and (3) offering a false or forged instrument for filing, registering, or recording are distinct and

separate.  *See Dixon*, 509 U.S. at 703-05, 113 S. Ct. at 2859-60 (*Blockburger* test satisfied); *see also Pickering*, 88 S.D. at 552-54, 225 N.W.2d at 100-01.  Because the State's successive prosecution did not place Ken twice in jeopardy, the circuit court did not err when it ruled that double jeopardy did not apply.

[¶26.]      However, Ken further contends that the *principles of res judicata* embodied within the Double Jeopardy Clause mandate that the State "should have" prosecuted him for all charges during the first trial.  Ken emphasizes that the State had a full and fair opportunity in the first trial to prosecute him for the charges it brought in the second trial.  He directs this Court to Justice Brennan's concurring opinion in *Ashe v. Swenson*, which suggests that "except in most limited circumstances, [the State must] join at one trial all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction."  *See* 397 U.S. 436, 453-54, 90 S. Ct. 1189, 1199, 25 L. Ed. 2d 469 (1970) (Brennan, J., concurring).  We, however, held in *Pickering* "that the plea of double jeopardy is available only when the separate offenses are in substance the same, so that the evidence which proves the one would prove the other and if an essential element of one is not necessarily present in the other there is no former jeopardy."  88 S.D. at 553, 225 N.W.2d at 101.  Because, here, Ken was not twice placed in jeopardy for the same act and because the offenses are separate and distinct, the State's successive prosecution did not violate his constitutional rights under the Fifth Amendment of the United States Constitution and Article Six of the South Dakota Constitution.

*Improper Venue*

[¶27.]    Ken next asserts that the circuit court erred when it did not dismiss the indictment for improper venue. He claims that the State presented no evidence that he "possessed, altered, forged or passed with intent to defraud the relevant documents in Lawrence County." Rather, according to Ken, the State only presented evidence that Getty Abstract in Sioux Falls caused the Special Power of Attorney and joint warranty deed to be filed in Lawrence County.

[¶28.]    A defendant has a right to be prosecuted in the county where the crime was committed. S.D. Const. art. VI, § 7; SDCL 23A-16-3. The State has the burden of proving proper venue by a preponderance of the evidence. *State v. Iwan*, 2010 S.D. 92, ¶ 9, 791 N.W.2d 788, 789. Direct proof, however, is not required. *State v. Greene*, 86 S.D. 177, 182-83, 192 N.W.2d 712, 715 (1971). Venue "is sufficiently established 'if the circumstances and evidence tend to the conclusion in a manner satisfactory to the jury that the place of the crime corresponds with that set forth in the information.'" *Id.* (quoting *State v. Dale*, 66 S.D. 418, 284 N.W.2d 770 (1939)).

[¶29.]    Here, the jury received three instructions on venue. The court informed the jury that in order to return a guilty verdict it must "determine if venue is proper in Lawrence County" as to each charge and that the State has the burden of proving that Ken committed the acts charged within Lawrence County. The court further instructed the jury: (1) "When a public offense is committed partly in one county and partly in another county or the acts or effects thereof constituting or requisite to the offense occur in two or more counties, the venue is in either county"; and (2) "Where the commission of a public offense involves the use of the mail, the

venue of the offense is in any county where the letter is deposited or delivered, or where it is received by the person to whom it is addressed."

[¶30.] From our review of the record, there is sufficient evidence for the jury to have concluded that venue was proper in Lawrence County on all charges. Ken resided in Lawrence County. The Hotel is located in Lawrence County. Further, Ken and Kim were the record owners of the Hotel with previous experience executing mortgage documents related to the Hotel in Lawrence County. The State presented evidence of email exchanges between Ken and Schreiber evincing Ken's knowledge that the original documents related to a deed on the Hotel would need to be filed in Lawrence County. Concerning the lease-to-buy-back agreement, Ken signed an owner's affidavit, which indicated that it would be mailed to Lawrence Title Company. The settlement statement, also signed by Ken, provided that payments were to be made in Lawrence County. From the evidence, the jury could reasonably infer that Ken offered the false or forged Special Power of Attorney and joint warranty deed (via his knowledge that Getty Abstract would mail the documents to Lawrence County to complete the closing) for filing, registering, or recording in Lawrence County. *See* SDCL 22-11-28.1. Ken could not complete his intended conveyance without having the Special Power of Attorney and joint warranty deed recorded in Lawrence County. *Contra Iwan*, 2010 S.D. 92, ¶ 14, 791 N.W.2d at 790-91 (no knowledge that check for insufficient funds would be mailed to a different county).

[¶31.] Further, although there is no direct evidence that Ken forged the Special Power of Attorney, the crime of forgery is of a nature to be completed in

secrecy.  Here, the jury heard that Ken called Dale prior to Ken's trip to Sioux Falls and asked Dale to execute a power of attorney.  The jury could reasonably infer from this that Ken's forgery scheme began in Lawrence County.  The jury could further infer that Ken's forgery scheme continued in Lawrence County when Ken, with the intent to defraud, caused the Special Power of Attorney and joint warranty deed to be passed in Lawrence County in order to complete the lease-to-buy-back agreement conveying Dale's interest in the Hotel.  *See* SDCL 22-39-36.  Therefore, the evidence and most favorable inferences therefrom support that the State established venue in Lawrence County by a preponderance of the evidence.

[¶32.]    We affirm.

[¶33.]    GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and KERN, Justices, concur.