#28880-a-JMK
**2020 S.D. 71**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

KEVIN BABCOCK,                            Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
BUTTE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MICHAEL W. DAY
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.


ERIC M. SCHLIMGEN of
Clayborne, Loos & Sabers, LLP
Rapid City, South Dakota                  Attorneys for defendant
                                          and appellant.

* * * *

CONSIDERED ON BRIEFS
NOVEMBER 4, 2019
OPINION FILED **12/16/20**

#28880

KERN, Justice

[¶1.]    A jury convicted Kevin Babcock of two counts of aggravated assault and two counts of simple assault for attacking his former significant other, Rosa Sosa, during a fight.  Babcock appeals, alleging the circuit court erred by granting the State's motion to exclude evidence of Sosa's drug use.  He also argues that his convictions for multiple counts of assault placed him in double jeopardy in violation of his constitutional rights.  We affirm.

## Facts and Procedural History

[¶2.]    On May 4, 2018, an altercation between Kevin Babcock and his former significant other, Rosa Sosa, resulted in Sosa sustaining numerous injuries, including marks on her throat consistent with strangulation, a head injury from being struck with a railroad spike, scratch marks, and bruising.  While being treated for her injuries at the hospital, a drug screen revealed that Sosa had methamphetamine in her system.

[¶3.]    As a result of this incident, a grand jury indicted Babcock for count 1—aggravated assault (domestic violence)[1] in violation of SDCL 22-18.1.1(4) (serious bodily injury); count 2—aggravated assault in violation of SDCL 22-18.1.1(1) (extreme indifference to human life) or, in the alternative, count 2A—aggravated assault in violation of SDCL 22-18-1.1(2) (dangerous weapon); count 4—simple assault in violation of SDCL 22-18-1(1) (attempt to cause bodily injury and actual

---

1.    SDCL 25-10-34 requires prosecutors to place a domestic violence notation on charging documents when the "charge involves domestic abuse."  As we reiterated in *State v. Wilson*, "the domestic notation does not signal an essential element of the underlying offense."  2020 S.D. 41, ¶ 35, 947 N.W.2d 131, 140.

-1-

ability to cause injury); and count 5—simple assault in violation of SDCL 22-18-1(5) (intentionally causes bodily injury that does not result in serious bodily injury). The grand jury returned a "no bill" on count 3—a resisting arrest charge. Babcock pled not guilty to all counts. The State also filed a part II information against Babcock alleging that he was a habitual offender.

[¶4.] A two-day jury trial was held from November 19–20, 2018. Immediately before trial, the State filed a motion in limine to exclude any evidence of Sosa's methamphetamine use and the positive drug screen that the hospital obtained in conjunction with Sosa's treatment. Before empaneling the jury, the court heard arguments from the parties and took the matter under advisement. During Sosa's cross-examination, Babcock's defense counsel requested an in-camera hearing to obtain a ruling on the State's motion. The court, after hearing additional arguments from counsel, granted the State's motion to exclude all evidence of Sosa's methamphetamine use. It excluded evidence of Babcock's methamphetamine use as well.[2]

[¶5.] The evidence produced at trial established that Sosa and Babcock had a tumultuous domestic relationship. Babcock was physically abusive and had a bad temper, but Sosa was not afraid of him and always defended herself by fighting back. The evening of May 4, 2018, was no exception. That day, Babcock and Sosa decided to go to Vale, South Dakota, to stay with one of Sosa's friends, Phil Heller. Once they arrived in Vale, Babcock went to a bar while Sosa and Heller went to

---

2. According to Sosa's testimony before the grand jury, Babcock had used methamphetamine the night before the fight.

Sturgis to run errands. When Sosa returned to Vale later that evening, she went to the bar to pick up Babcock. Although Babcock was reluctant to go, he eventually agreed to leave with Sosa.

[¶6.]     Sosa, by her own admission, was in a bad mood when they arrived at Heller's house. She testified that she went inside to shower and eat while Babcock fell asleep in the car. At some point, Sosa went out to the car and began berating and yelling at Babcock, telling him: "I'm at least with some friends. Some real friends . . . . What do you have?" She testified that the fight escalated when she got into the passenger seat of the vehicle. From there, Sosa stated that "things got out of hand" as Babcock choked her, punched her, and scratched her. After she fought "back with every possible force [she] had," he released her throat. At some point "he came at [her] through the door of the passenger seat." She began kicking the door in an effort to push him away. She kicked the door so hard that she damaged it.

[¶7.]     Sosa could not precisely recall the exact sequence of the events after the first physical conflict or how she sustained her head wound. Nor, she admitted, did she remember what type of object caused it, although she stated that Heller later told her it was a railroad spike. She did, however, recall that she was sitting in the vehicle when she first noticed the blood on her clothing. When asked about whether the fight occurred during separate incidents or during one encounter, Sosa stated that it was "all the same." However, she later clarified that by "all the same," she meant the fight occurred on the same day. Sosa testified that after being struck with the object, she returned to the house where Heller discovered her injuries.

[¶8.]    Heller's testimony at trial and Sosa's initial report to police, which were relayed to the jury through body camera footage from the responding officers, suggest that Babcock and Sosa left the car after their initial altercation and continued the physical fight in the yard. When officers questioned Sosa about the incident, she stated that she and Babcock initially fought in the vehicle before getting out and walking toward the house. Sosa claimed that while outside of the car, Babcock pulled her hair.

[¶9.]    According to Heller, Babcock and Sosa came inside the house after the first altercation. When they entered, Heller, who did not witness the fight, saw that Babcock had a small amount of blood spatter on his face and a bite mark on his leg. Heller testified that Babcock told him Sosa had bitten him and was crazy. Heller stated that aside from Babcock's leg injury, he did not observe any serious injuries to either person when they first entered the house.

[¶10.]    After a brief time, Heller testified that Babcock and Sosa went back outside to continue the affray, walking past a pile of old railroad spikes on the front porch on their way out. The parties continued to argue outside and got back into the car where the second fight began. The State alleged that during this scuffle, Babcock struck Sosa on the side and top of her head with one of the spikes.

[¶11.]    After being struck with the spike, Sosa began to bleed profusely. She and Babcock returned to the house. Sosa went into a room used as an office in the front of the house, while Heller and Babcock sat in Heller's bedroom where he had a TV and chairs. Heller stated that Babcock picked up a dull knife and informed Heller that he did not want to live anymore. Babcock asked Heller where his gun

was, and Heller replied, "What gun?" Heller stated that, for some time, he tried to talk Babcock into putting the knife down, but he could not reason with him.

[¶12.]    Heller then decided to check on Sosa. He found her in the front room sitting on a couch holding paper towels to her face. Heller inspected her wounds and discovered a deep gash above her eye. Sosa did not want to call the police because she did not want to get Babcock in trouble. Concerned for her well-being, Heller suggested that Sosa go with him to see his friend, Larry Schumacher, a field medic with the Army National Guard, who lived nearby and could render first-aid. Sosa agreed, and they left for Schumacher's house, leaving Babcock behind.

[¶13.]    Schumacher testified that when Sosa arrived at his home, he assessed her wounds and concluded that her injuries were severe. While cleaning the larger of her head wounds, he saw that the back of Sosa's eye socket was visible through the gaping hole. Although Sosa remained reluctant to involve law enforcement, Schumacher called dispatch for help. Butte County Sheriff Deputy Casey McKenzie (Deputy McKenzie) testified that he was the first to respond and spoke to Schumacher's wife outside when he arrived at the residence. After this discussion, he called an ambulance and entered the residence to assess Sosa's injuries. Sosa was "very calm" and cooperative, telling Deputy McKenzie that Babcock had assaulted her at Heller's house and that Babcock was still there. Deputy McKenzie recorded his interview with Sosa on his body camera and photographed her injuries. While the ambulance was en route, Deputy McKenzie left the Schumacher house and drove to the Heller residence.

[¶14.]     Deputy McKenzie testified that when he arrived at Heller's house, he learned that Babcock had barricaded himself inside. For two hours, Heller and several others attempted to talk Babcock into coming out of the house. Eventually, it became clear that Babcock would not come out voluntarily, so the officers went inside to arrest him. Babcock was in the back bedroom when the officers entered. A brief struggle ensued before the officers were able to subdue him. A search incident to Babcock's arrest revealed that Babcock had a double-edged dagger in his back pocket. The officers also discovered a railroad spike, covered in what appeared to be blood, in the room where he was hiding.

[¶15.]     In the meantime, Sosa was taken to the Sturgis Hospital. Dr. Natalie Tymkowych, the emergency room physician who examined her, testified that she initially observed an open wound above Sosa's left eye and a second wound on top of her head. She also noted that Sosa had a large bruise on her forehead and marks on her neck and chest. The results of a CAT scan[3] revealed a skull fracture comprised of a temporal bone fracture above the left eye. Dr. Tymkowych also noticed abnormal swelling and bruising around Sosa's neck and chest, prompting her to conclude that her airway had been restricted by someone or something that had put significant pressure on her neck. Due to the severity of her injuries, Dr. Tymkowych transferred Sosa to Rapid City Regional Hospital for further treatment and advanced imaging tests.

---

3.     A CAT scan or computerized axial tomography, combines data from a series of x-ray images to provide cross-sectional images of structures inside the body.

[¶16.] In his opening statement, Babcock's counsel informed the jury that the evidence would show that his client acted in self-defense and that Sosa was the aggressor. In Babcock's version, after leaving the residence the first time and returning to the car, Sosa "brought the railroad spike to the fight" and was injured in the struggle that ensued as he attempted to defend himself from her attack. Babcock did not testify at trial and relied on testimony elicited from Sosa on cross-examination to support his theory.

[¶17.] At the close of the State's case, Babcock moved for judgment of acquittal, which the court denied. Babcock then requested that, because Sosa had testified that there was just one altercation, the court should instruct the jury that all the assault charges must be considered in the alternative to avoid "double jeopardy issues." The court denied the request and gave the jury separate instructions for each count, with only count 2 and 2A being in the alternative.

[¶18.] The jury found Babcock guilty of two counts of aggravated assault and of both counts of simple assault. More specifically, it convicted Babcock of count 1—aggravated assault in violation of SDCL 22-18-1.1(4) (serious bodily injury) and count 2A—aggravated assault in violation of SDCL 22-18.1.1(2) (dangerous weapon). With respect to simple assault, the jury convicted him of count 4 for violating SDCL 22-18-1(1) (attempting to cause injury plus actual ability to harm) and count 5 in violation of SDCL 22-18-1(5) (intentionally causing bodily injury not amounting to serious bodily injury). The State dismissed the part II information.

[¶19.] The court sentenced Babcock to ten years in the penitentiary, with three years suspended on each felony count, to be served consecutively, with credit

for time served.  For each of the simple assault convictions, the court sentenced

Babcock to serve 250 days in jail, with credit for 250 days served, to run

concurrently to each other and to the felony convictions.  The court also imposed

fines, fees, and restitution.

[¶20.]      Babcock appeals,[4] raising several issues for our review, which we

restate as follows:

> I.      Whether the circuit court erred in granting the State's motion in
>         limine.
>
> II.     Whether Babcock's prosecution subjected him to double
>         jeopardy.

**Standard of Review**

[¶21.]      "The trial court['s] evidentiary rulings are presumed to be correct."

*State v. Boston*, 2003 S.D. 71, ¶ 13, 665 N.W.2d 100, 105.  We review such rulings

for an abuse of discretion.  *State v. Crawford*, 2007 S.D. 20, ¶ 13, 729 N.W.2d 346,

349.  "An abuse of discretion is a discretion exercised to an end or purpose not

justified by, and clearly against, reason and evidence."  *State v. Hayes*, 2014 S.D. 72,

¶ 22, 855 N.W.2d 668, 675.  It is "a fundamental error of judgment, a choice outside

the range of permissible choices, a decision, which, on full consideration, is arbitrary

or unreasonable."  *State v. Delehoy*, 2019 S.D. 30, ¶ 22, 929 N.W.2d 103, 109.  We

review de novo, Babcock's alleged constitutional violation based on the prohibition

against double jeopardy.  *State v. Outka*, 2014 S.D. 11, ¶ 7, 844 N.W.2d 598, 603.

---

4.      Babcock is represented by different counsel on appeal.

## Analysis and Decision

### I. *Whether the circuit court erred in granting the State's motion in limine.*

[¶22.] Our rules of evidence are well-settled. "All relevant evidence is admissible" unless an exclusionary rule prohibits it. *See* SDCL 19-19-402. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." SDCL 19-19-403.

[¶23.] Prior to making its evidentiary ruling, the circuit court considered arguments from counsel on the admissibility of Sosa's drug test. Babcock urged the court to deny the motion, arguing that Sosa's positive drug screen was relevant and admissible to show that she was under the influence on the night of the attack, which may have impacted her credibility as a witness and her recollection of the events. Additionally, Sosa's drug use, in Babcock's view, helped establish his theory that he was acting in self-defense because Sosa was out of control that evening.

[¶24.] The State claimed that Sosa's drug use was not relevant because she did not appear to be under the influence at the time of the fight, during the hours following the fight, or while receiving treatment for her injuries. The State further argued that because methamphetamine remains in the human body for days after use, Babcock could not establish that she was high during the altercation. The State contended that even if Sosa's methamphetamine use was relevant, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under Rule 403. Finally, the State argued that if the circuit court

denied the State's motion, it would "open the door" to the admissibility of Babcock's drug use as well, which the State alleged was an "extensive part of [Babcock's] life."

[¶25.] The court, as an initial matter, found that Sosa's positive drug test was "relevant to that whole evening of how she reacted, how he reacted." The court noted, however, that while both parties had been drinking and Sosa had methamphetamine in her system, there was no testimony offered about *when* she had ingested methamphetamine—"It could have been two days prior, could have been the day of. I don't know. We don't have that evidence." The court rejected the notion that Sosa's methamphetamine use "goes to credibility of who is telling the truth and who isn't telling the truth."

[¶26.] The court ultimately excluded the evidence under SDCL 19-19-403, finding that if admitted, the evidence would confuse the issues, delay the case, and mislead the jury. The court reasoned that admitting evidence of Sosa's drug habits would make Babcock's drug use relevant as well, which would result in a trial of "little mini cases" increasing the risk that the jury would find "Babcock guilty of being a meth user[.]" The court expressed concern that this information would derail the purpose of the trial, which was to determine whether Babcock had assaulted Sosa or whether he was acting in self-defense. We agree.

[¶27.] First, in order for Sosa's test results to be admissible to challenge her ability to accurately recall the events, or to further explain her behavior, Babcock needed to offer testimony that she was still under the influence at the relevant time in question, and if so, how it may have impacted her behavior or memory. This he did not do. We emphasized the significance of the time of ingestion when

considering the admissibility of drug use in *Estate of Holznagel v. Cutsinger*, involving a wrongful death action against a motorist and addressing the admissibility of evidence of the motorist's marijuana use five hours before the accident in question. 2011 S.D. 89, ¶¶ 3, 17, 808 N.W.2d 103, 104, 107. We held that "[a]sking jurors to assess how an intoxicating substance *may* impair one's perception hours after ingestion, without assistance of an expert, differs from asking jurors to assess how acutal intoxication impairs perception." *Id.* ¶ 17, 808 N.W.2d at 107. Given this lack of foundational evidence supporting its relevance, we concluded "the trial court did not abuse its discretion in determining that the probative value of the evidence was outweighed by the danger of unfair prejudice[.]" *Id. See also Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1058 (N.D. Ill. 2009) (referring to a party's admissions to smoking marijuana on the date of the incident in question as "highly inflammatory and prejudicial evidence"). In excluding this evidence here, the court carefully balanced the relevance of this evidence against the dangers listed in SDCL 19-19-403. Based on our review of the circuit court's reasons for exclusion, its ruling was not "a choice outside the range of permissible choices[.]" *See Delehoy*, 2019 S.D. 30, ¶ 22, 929 N.W.2d at 109.

[¶28.] However, even if the court's evidentiary ruling was erroneous, "the error must be prejudicial in nature before we will overturn the ruling." *State v. Hauge*, 2013 S.D. 26, ¶ 24, 829 N.W.2d 145, 152 (quoting *State v. Jucht*, 2012 S.D. 66, ¶ 47, 821 N.W.2d 629, 640). Babcock has failed to establish that the error was prejudicial, i.e., that "in all probability . . . it produced some effect upon the final result[.]" *See id.* Despite the circuit court's ruling, nothing prevented Babcock from

presenting his claim of self-defense or from engaging in a robust cross-examination of Sosa to test her recollection of the events. Indeed, Babcock's counsel rigorously questioned Sosa regarding her alcohol consumption, her faulty memory, and her role in initiating and provoking the assaults.

[¶29.] From our review of the record, the State presented a strong case against Babcock. Notably, the only evidence which came close to supporting Babcock's theory of self-defense came from his cross-examination of Sosa in which she admitted starting the verbal arguments and biting Babcock at one point to get away from him. Therefore, any further attempts to impeach Sosa's credibility may have been counterproductive to Babcock's reliance on several of her statements. In any event, the physical evidence showed that other than the bite mark and a small scratch, Babcock was not injured in the altercations, while Sosa suffered a skull fracture, two deep head wounds, bruises and swelling to her neck consistent with strangulation, numerous scratches, and a number of abrasions. Given this evidence, we cannot conclude that, had the evidence of Sosa's methamphetamine use been admitted, there is a reasonable probability that the jury would have reached a different verdict. Therefore, Babcock has failed to establish that he was prejudiced by the exclusion of this evidence.

> ### II. Whether Babcock's prosecution subjected him to double jeopardy.

[¶30.] Babcock next asserts that his convictions subjected him to double jeopardy. He raises numerous claims to substantiate his constitutional challenge,

including that the indictment contained both multiplicitous and duplicitous counts.[5]

During Babcock's motion for judgment of acquittal, he did not argue that the

charges in the indictment might be duplicitous. Rather, Babcock raised the theory

of multiplicity by asking that the court submit all charges to the jury in the

alternative. In particular, he requested that the counts in the indictment "be

alternative counts if [the State] want[s] to charge him with a count of aggravated

assault. This was one incident that happened . . . . All of the ag[gravated] assaults

should be alternatives."

[¶31.]     The prohibition against double jeopardy contained in the Fifth

Amendment to the United States Constitution, and Article VI, Section 9, of the

South Dakota Constitution, "protect[s] against three types of governmental abuses:

(1) a second prosecution for the same offense after acquittal; (2) a second

prosecution for the same offense after conviction; and (3) multiple punishments for

the same offense." *State v. Garza*, 2014 S.D. 67, ¶ 10, 854 N.W.2d 833, 837.

Multiplicity and duplicity fall within the third type of abuse. As we explained in

*State v. Muhm*,

> "Duplicity" is the joining in a single count of two or more distinct
> and separate offenses . . . . Multiplicity, on the other hand, is
> the splintering of a single offense into separate counts in an
> indictment. 1 Nancy Hollander et al., *Wharton's Criminal
> Procedure* § 5:12 (14th ed. 2008). In other words, a duplicitous
> indictment or information includes a single count that captures

---

5.    Babcock did not move for a bill of particulars prior to trial; nor did he move to
      dismiss the indictment for multiplicity or duplicity. On several occasions, we
      have held that when a defendant believes he needs a more specific indictment
      in order to defend against the charges lodged against him, he should move for
      a bill of particulars. *See, e.g., State v. Darby*, 1996 S.D. 127, ¶ 11, 556 N.W.2d
      311, 316; *State v. Anderson*, 1996 S.D. 46, ¶ 16 n.8, 546 N.W.2d 395, 400 n.8.

> multiple offenses, whereas a multiplicitous indictment or information includes multiple counts all charging a single offense.

2009 S.D. 100, ¶ 19, 775 N.W.2d 508, 514.

### a. *Multiplicity of the indictment*

[¶32.] If the crimes involve different factual scenarios, the Double Jeopardy prohibition does not apply at all. *See, e.g.*, *State v. McMillen*, 2019 S.D. 40, ¶ 16, 931 N.W.2d 725, 730; *State v. Thomason*, 2015 S.D. 90, ¶ 25, 872 N.W.2d 70, 76–77; *State v. Pickering*, 88 S.D. 548, 553, 225 N.W.2d 98, 101 (1975). Our review, therefore, requires assessment of Babcock's convictions to determine whether they are based on "the same facts and actions." *Wilcox v. Leapley*, 488 N.W.2d 654, 656 (S.D. 1992). This inquiry is necessarily "a question of fact based on the particular circumstances of each case." *See State v. Johnston*, 478 N.W.2d 281, 284 (S.D. 1991) (analyzing whether counts of grand theft were the product of "separate independent takings or one general scheme[.]").

[¶33.] Here, the first conviction (count 1) of aggravated assault charged Babcock with a violation of SDCL 22-18-1.1(4), which provides that a person is guilty of aggravated assault if he "[a]ssaults another with intent to commit bodily injury which results in serious bodily injury."[6] At trial, the State presented evidence that Babcock choked Sosa to establish this violation. In particular, Sosa testified that Babcock choked her when they were in the car. Dr. Tymkowych also testified about the dangerous nature of strangulation and that the marks on Sosa's

---

6. Although SDCL 22-18-1.1(8) also criminalizes the act of "impeding the normal breathing or circulation" of another, the State was not precluded from pursuing its theory under SDCL 22-18-1.1(4) alleging serious bodily injury.

throat were consistent with marks caused by being choked. Dr. Tymkowych further indicated that, "something or someone had put significant pressure on her neck" that had "cut off her airway for some amount of time."

[¶34.]      As to the second conviction, (count 2A), the State presented evidence that Babcock committed aggravated assault under SDCL 22-18-1.1(2). Under subsection (2), a defendant is guilty of aggravated assault if he "[a]ttempts to cause, or knowingly causes, bodily injury to another with a dangerous weapon[.]" The State supported this count with evidence that Babcock stabbed Sosa twice in the face with the railroad spike. In particular, the jury considered Heller's testimony that after the brawl in the car, Sosa and Babcock returned to the house and had a brief cooling-off period before they went back outside where a second fight occurred in the car.

[¶35.]      Therefore, the evidence supports that the assault with the spike occurred after the strangulation and was committed in a separate manner. *See Wilcox*, 488 N.W.2d at 656-57. Because the assaults were the product of two distinct criminal offenses, each separately punishable under SDCL 22-18-1.1, we find no multiplicity with respect to Babcock's aggravated assault convictions.

[¶36.]      Our conclusion is further strengthened by Babcock's counsel's opening and closing statements, in which he described the initial fight in the car, the brief cooling-off period, and the second fight involving the railroad spike.[7] During closing, Babcock's counsel stated: "*Now, that's the first assault* where we have Mr.

---

7.      During his motion for judgment of acquittal, counsel for Babcock contradicted this theory by asserting that his altercations with Sosa constituted a single fight requiring all counts to be charged in the alternative.

Babcock being bit and scratched and bleeding. You heard Mr. Heller. There is no mark on her. So Mr. Babcock has been assaulted. Okay. Already, *before we even go to the next round.* So he goes back to the car to go to sleep. Okay. Now, Ms. Sosa comes back and she comes back with a weapon. She comes back with a railroad spike[.]" (Emphasis added.) Therefore, the circuit court did not error in rejecting Babcock's request that all the aggravated assault charges be submitted to the jury as alternative counts.

[¶37.] With respect to simple assault, the jury convicted Babcock under two different subsections of SDCL 22-18-1. The first conviction under subsection (5) required the State to prove that Babcock "[i]ntentionally cause[d] bodily injury to another which d[id] not result in serious bodily injury." SDCL 22-18-1(5). For support, the State relied on the fact that Babcock "hit [Sosa] repeatedly. She had bruising on her neck and shoulders. She had scratches on her face." Further, Sosa testified about multiple hits and scratches that she sustained while fighting with Babcock in the car.

[¶38.] The second simple assault count involved an alleged violation under subsection (1), which required the State to prove that Babcock "[a]ttempt[ed] to cause bodily injury to another and ha[d] the actual ability to cause the injury[.]" SDCL 22-18-1(1). With respect to this conviction, the State presented evidence that, after Babcock got out of the car, he pursued Sosa and pulled her hair. Although the record is somewhat unclear on the timeline, the State relied upon video from Deputy McKenzie's body camera that recorded Sosa telling Deputy McKenzie that Babcock "just got out of the car and grabbed me by the hair." These

offenses, like the aggravated assault convictions, are based on separate actions constituting two different crimes.[8] Therefore, the circuit court properly submitted the simple assault charges to the jury as separate offenses.

### b. *Duplicity of the Indictment*

[¶39.] We have addressed the issue of duplicity several times in our jurisprudence. "Duplicity is the joining in a single count of two or more distinct and separate offenses." *Muhm*, 2009 S.D. 100, ¶ 19, 775 N.W.2d at 514. "In other words, a duplicitous indictment or information includes a single count that captures multiple offenses[.]" *Id.* We discussed the multiple "vices" of duplicity in *Muhm*. One such vice occurs when a "jury has multiple [acts] to consider under a single count" in which case "the jury may convict without reaching a unanimous agreement on the same act, thereby implicating the defendant's right to jury unanimity." *Id.* ¶ 29, 775 N.W.2d at 517.

---

8.  Babcock also argues that the court should have instructed the jury that simple assault under SDCL 22-18-1(1) and (2) is a lesser included offense of aggravated assault under SDCL 22-18-1.1(1). He claims that the failure to do so requires that "his conviction[] for the lesser-included [] offense[] [be] vacated." Babcock's argument fails at the outset because he was not convicted on count 2, which charged aggravated assault under SDCL 22-18-1.1(1); therefore, there are no lesser included offenses under that charge to vacate. In addition, because Babcock did not request a lesser included instruction as to any of the aggravated assault charges submitted to the jury, he has forfeited this issue. *See* SDCL 22-16-20.2 ("The failure to request lesser included offense instruction constitutes a waiver of the right to such an instruction."). Finally, each simple assault charge for which Babcock was convicted was based upon separate and distinct acts aside from the acts supporting the aggravated assault charge. Thus, a request to treat the simple assaults as lesser included offenses is essentially the same as Babcock's argument that all the assault charges should have been submitted to the jury in the alternative, an argument we have rejected.

[¶40.] To solve this unanimity concern, we have adopted the either/or rule. This "rule does not require dismissal of a duplicitous indictment. Rather, the [State] must elect a single offense on which it plans to rely, and as long as the evidence at trial is limited to only one of the offenses in the duplicitous count, the defendant's challenge will fail. Alternatively, if there is no election the trial court should instruct the jury it must find unanimously that the defendant was guilty with respect to at least one of the charges in the duplicitous count." *Id.* ¶ 32, 775 N.W.2d at 518-19. For "single act offenses . . . the due process right to jury unanimity requires that the jury be unanimous as to the single act or acts that are the basis for the verdict" on a particular count. *Id.* ¶ 30, 775 N.W.2d at 517-18.

[¶41.] On appeal, Babcock contends the court plainly erred by failing to require the State to either "dismiss the duplicitous indictment or elect a single offense" to ensure jury unanimity. Babcock's first contention, which appears to conflate the concepts of multiplicity and duplicity, is misplaced. On its face, the indictment here was not duplicitous. Each count set forth a separate statutory subsection of aggravated assault, and at trial, the State presented separate identifiable acts to independently support each charge. Therefore, for similar reasons as explained in the preceding analysis addressing Babcock's multiplicity argument, we reject his claim that the indictment should have been dismissed on duplicity grounds.

[¶42.] As to his alternative argument that the State should have been required to elect specific acts to support each charge, Babcock is correct in that the jury was required to unanimously agree that the *same* set of facts satisfied the

elements for each offense in order to convict him on a particular count. Here, it appears the State attempted to satisfy the either/or rule in closing argument by tying specific acts to specific counts; however, the State's attempts fell short because of the confusing nature of the arguments presented.

[¶43.]        For example, the State referred to serious bodily injury during its initial closing argument when discussing Babcock's act of striking Sosa with a railroad spike, and also while explaining his act of choking her. "Serious bodily injury" is referenced within the elements of two of the aggravated assault charges against Babcock, albeit in a different manner—count 1 (SDCL 22-18-1.1(4)) (act "which *results* in serious bodily injury" (emphasis added)) and count 2 (SDCL 22-18-1.1(1)) ("[*a*]*ttempts to cause* serious bodily injury . . . under circumstances manifesting extreme indifference" (emphasis added)). The State did not specify in its initial argument which counts it referred to when it discussed serious bodily injury related to Babcock's strangulation of Sosa and Babcock's strikes to Sosa's head with a railroad spike. However, in its rebuttal argument, the State explained that Babcock caused serious bodily injury when he hit Sosa with the railroad spike and therefore satisfied count 1. Yet, the State also argued, in rebuttal, that the railroad spike is a dangerous weapon, a required element in only one of the aggravated assault charges—count 2A (SDCL 22-18-1.1(2)), the alternative charge to count 2 (extreme indifference). The State then suggested that both the strangulation and Babcock's repetitive strikes to the back of Sosa's head demonstrated an extreme indifference to human life.

[¶44.]     Under the scenario here, where the State argued more than one act to support each charge, an unanimity instruction should have been given to ensure that the jurors all agreed upon the *same* acts that satisfied the necessary elements for each count at issue.  However, Babcock did not request such an instruction, nor did the circuit court provide the jury with one on its own accord.  Therefore, we review this issue for plain error.  *See State v. Brende*, 2013 S.D. 56, ¶ 18, 835 N.W.2d 131, 139-40 (reviewing unanimity issue for plain error).

[¶45.]     To establish plain error, Babcock must show "(1) error, (2) that is plain, (3) affecting substantial rights; and only then may this Court exercise its discretion to notice the error if, (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *McMillen*, 2019 S.D. 40, ¶ 13, 931 N.W.2d at 729-30.  Establishing all four prongs is onerous, "as it should be." *Puckett v. United States*, 556 U.S. 129, 135, 129 S. Ct. 1423, 1429, 173 L. Ed. 2d 266 (2009).  "Additionally, with plain error analysis, [Babcock] bears the burden of [proving that] the error was prejudicial." *State v. Greenwood*, 2016 S.D. 81, ¶ 16, 887 N.W.2d 726, 729.  "'Prejudice' in the context of plain error requires a showing of a 'reasonable probability' that, but for the error, the result of the proceeding would have been different." *State v. Fifteen Impounded Cats*, 2010 S.D. 50, ¶ 33, 785 N.W.2d 727, 283 (quoting *United States v. Rush-Richardson*, 574 F.3d 906, 911 (8th Cir. 2009)).

[¶46.]     From our review of the record, even though a unanimity instruction would have alleviated any confusion that might have been caused by the State's less than clear attempt to tie certain acts to each aggravated assault count, reversal is

unnecessary because Babcock has not established prejudice.[9] This was not a case presenting the scenario where "separate and distinct [acts] of abuse" are "alleged in a one-count indictment[.]" *See State v. White Face*, 2014 S.D. 85, ¶ 1, 857 N.W.2d 387, 389. Here, none of the alleged assault counts were charged under the same statutory subsection, and the evidence at trial was composed of distinct acts that would align with each count. Therefore, unlike the facts in *White Face*, where "risk of division among the jurors was a significant potential . . . because the mechanism of injury to the child was not clear[;]" here, risk of division is diminished due to the different methods Babcock employed to injure Sosa. *See id.* ¶ 24, 857 N.W.2d at 395. In particular, the State presented two acts supporting the aggravated assault charges—one involved strangulation and the other involved hitting Sosa with a railroad spike, an object the State argued to be a dangerous weapon.[10] But only one of the aggravated assault charges submitted to the jury required the use of a dangerous weapon.

[¶47.]     Moreover, the court properly instructed the jury in Instruction number 42 that "[a] separate offense is charged in each of the counts in the [i]ndictment. You must separately consider each count and the evidence which applies to it. The

---

9.     We need not address the second element, whether the failure to give an unanimity instruction under the unique scenario presented here was plainly erroneous because, absent prejudice, even a plain error does not merit reversal.

10.    The court instructed the jury that a dangerous weapon meant "any firearm, stun gun, knife or device, instrument, material or substance, whether animate or inanimate, which is calculated or designed to inflict death or serious bodily harm, or by the manner in which it is used is likely to inflict death or serious bodily harm."

fact that you may find the Defendant guilty or not guilty on any one count of the [i]ndictment must not control or influence your verdict on any other count or counts of the [i]ndictment." The court also instructed the jury in Instruction number 43 that Babcock could only be found guilty of one of the alternatively charged aggravated assault counts, one of which was the dangerous weapon charge.

[¶48.] Considering the instructions given and assessing the evidence "in a commonsense manner," *Id.* ¶ 23, 857 N.W.2d at 395, we do not think there is a reasonable probability that the jury convicted Babcock on each of the two aggravated assault charges without reaching a unanimous agreement on the same act for each charge. Therefore, Babcock has failed to establish plain error on this record.

[¶49.] Nevertheless, the better practice in cases involving multiple incidents is to set forth at the outset in the charging document, the nature of the criminal act the State alleges the defendant committed as occurred in *State v. Augustine*, 2000 S.D. 93, ¶ 9, 614 N.W.2d 796, 797. The jury can also be properly informed of which offense corresponds to each count by the use of proper jury instructions, or, if clearly and succinctly stated, it can be expressed during closing remarks.

## Conclusion

[¶50.] The circuit court did not abuse its discretion by granting the State's motion in limine excluding evidence of the victim's methamphetamine use. Additionally, we reject Babcock's double jeopardy claims and affirm his convictions.

[¶51.] GILBERTSON, Chief Justice, and JENSEN, SALTER, and DEVANEY, Justices, concur.